William O. SCHISM and Robert
Reinlie, Plaintiffs–
Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 99–1402.

United States Court of Appeals,
Federal Circuit.

Nov. 18, 2002.

George E. Day, Day and Meade, P.A., of Ft. Walton Beach, FL, argued for plaintiffs-appellants. With him on the brief was Timothy I. Meade. Of counsel was Henry M. Holzer, of Santa Fe, NM.

E. Roy Hawkens, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; and Barbara C. Biddle, Attorney.

John A. Dragseth, Fish & Richardson, P.C., P.A., of Minneapolis, MN, for amici curiae Disabled American Veterans, et al. With him on the brief was Richard J. Anderson.

Jonathan S. Williams, of Goldsboro, NC, for amicus curiae The Alliance of Retired Military, etc.

Before MAYER, Chief Judge, NEWMAN and MICHEL, Circuit Judges, PLAGER, Senior Circuit Judge, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL, in which Circuit Judges LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, LINN, DYK, and PROST join.

Dissenting opinion filed by Chief Judge MAYER, in which Circuit Judge PAULINE NEWMAN, Senior Circuit Judge PLAGER, and Circuit Judge GAJARSA join.

Dissenting opinion filed by Senior Circuit Judge PLAGER.

MICHEL, Circuit Judge.

To induce people to join the armed services during the World War II and Korean War era and make it a career, military recruiters, under the direction of superiors, orally promised recruits that if they served on active duty for at least 20 years, they would receive free lifetime medical care for themselves and their dependents. The government concedes such promises were made in good faith and relied upon. Plaintiffs allege that they were fulfilled until 1995 when, plaintiffs assert, the government breached these implied-in-fact contracts by effectively denying them free care so they had to purchase Medicare Part B insurance in order to be treated by civilian doctors or obtain medications without paying fees because space was no longer available in military facilities where care and medications were free. We must decide whether the government is bound by those promises.

Plaintiffs Schism and Reinlie appeal from a summary judgment by the United States District Court for the Northern District of Florida holding that because the promises were not authorized they are not enforceable. *Schism v. United States,* 19 F.Supp.2d 1287, 1295 (N.D.Fla.1998).

The district court concluded that because no statute authorized these promises, no valid contract was formed between the government and plaintiffs (or other similarly-situated military retirees, *i.e.*, those who entered service prior to 1956 and by 1995 were 65 or more years of age). *See id.*

Plaintiffs allege they were "promised full post retirement medical care for themselves and their dependents in military hospitals," First Amended Complaint at 2, and that because for decades Congress funded such free care this promise gave rise to an implied-in-fact contract. They claim the government breached these promises of lifetime free medical care in 1995 by promulgating regulations to implement Tricare (a program that offered government-funded health care by civilian doctors to retirees *under* age 65), codified at 32 C.F.R. § 199.17.[1] *See* Reply Brief at 2. Indeed, plaintiffs state that "the government forced [them] to go to Medicare and pay for their own medical care." *Id.* Nothing in the Tricare implementing regulation, however, requires retirees 65 or older to elect Medicare Part B coverage; rather plaintiffs here freely elected to do so, despite the fact that they were still entitled to receive free medical care at military facilities on a space-available basis. *See* 32

C.F.R. § 199.17(f)(1). Plaintiffs presumably purchased additional medical coverage under Medicare Part B because while they remained entitled to space-available treatment in military facilities, as a practical matter, such space was less often available than before.[2] As a result, plaintiffs complain that, whereas in the past they nearly always received complete free care, they now had to pay Medicare Part B premiums in order to receive less care without paying fees.[3] Accordingly, the plaintiffs' claim implies that either Congress was obligated to maintain military medicine sufficient for their treatment, or in the alternative, to make them eligible for free health insurance coverage (such as Tricare) enjoyed by retirees under 65. And the damages they seek represent the monthly Medicare fees plaintiffs have paid since 1995. They sued under the Little Tucker Act. *See* 28 U.S.C § 1346(a)(2) (2000).

The principal question before us is whether the promises made to the plaintiffs, older Air Force retirees, were within the authority of the Air Force Secretary under 5 U.S.C. § 301 in view of annual congressional appropriations for military medicine, as the plaintiffs assert. Because 5 U.S.C. § 301 at most authorizes space-available treatment, and not free health

---

1. We note at the outset that neither Tricare in 1995 nor CHAMPUS before it provided for any health care insurance coverage paid for by the government for retirees who were "Medicare eligible," *i.e.*, over 65. *See* 32 C.F.R. § 199.4(e)(3)(vi) (1995) (CHAMPUS), 32 C.F.R. § 199.17(c)(3)(i) (1995) (Tricare). Thus, it would seem the breach, if any, first occurred in 1956 as well as 1966 and 1986 when Congress enacted programs that failed to include retirees who were 65 or older.

2. This was due to the combined effect of Congress downsizing military medical facilities and the 1995 regulations which continued to

place retirees 65 or older at the bottom of the preference list of all groups entitled to military medical care. *See* 32 C.F.R. § 199.17(d)(1).

3. Medicare Part B provides for medical insurance (as opposed to hospitalization insurance) and helps pay for doctors' services, outpatient care, and various other medical services that Medicare Part A (hospital insurance) does not cover. However, while Part A is free, under Part B beneficiaries must pay premiums, co-pays, and deductibles.

insurance for life, we hold that the Air Force Secretary lacked the authority in the 1950s when plaintiffs joined to promise free and *full* medical care.

Further, under long-standing Supreme Court precedent, "common-law rules governing private contracts have no place in the area of military pay," *Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961), or pensions and hospital privileges, *see Lynch v. United States,* 292 U.S. 571, 577, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (citing *United States v. Teller,* 107 U.S. 64, 68, 2 S.Ct. 39, 27 L.Ed. 352 (1883) for the proposition that the grant of pensions and such privileges creates no vested right in the recipient and can be withdrawn or redistributed by Congress at any time). Thus military retiree compensation, including free military medical care and government-provided insurance, is controlled exclusively by statute, and so an action for breach of an implied-in-fact contract cannot lie. *See id.*

Accordingly, we must affirm the district court's judgment and can do no more than hope Congress will make good on the promises recruiters made in good faith to plaintiffs and others of the World War II and Korean War era—from 1941 to 1956, when Congress enacted its first health care insurance act for military members, excluding older retirees. Although these retirees were made eligible for free insurance effective in 2002, such relief was prospective only, leaving them uncompensated for insurance expenses incurred from 1995–2001, the subject of the relief they request here.

## Background

The essential facts in this case are undisputed. For an extensive treatment of all the facts, see the opinion of the district court. *Schism,* 19 F.Supp.2d at 1288–89. The present opinion will treat only the facts relevant to our analysis.

Schism and Reinlie each accumulated 20 years of active duty in the Armed Services. Schism enlisted in the United States Navy in April 1943, and was honorably discharged in February 1946. In 1951, he received an indefinite appointment in the Air Force. In 1956, he began active service, which continued until his retirement in 1979. Thus, his Air Force service alone entitled him to retirement benefits.

Reinlie enlisted in the United States Army in 1942 and served on active duty until October 1945. He entered the Air Force in 1951 and, in 1953, he received an indefinite term appointment. Reinlie served continuously until he retired from the Air Force in 1967. While the precise dates of Reinlie's service are not in the record before us, he apparently had sufficient retirement credits between his World War II service and his subsequent Air Force service to total 20 years. The government has indicated that the relevant start of service dates for plaintiffs are 1951 for Schism and 1953 for Reinlie, the dates of their indefinite appointments. The retirees do not dispute this fact, so we deem these to be the relevant dates. Therefore, the only promises that matter are those of the Air Force recruiters in 1951 and 1953.

At the time the retirees joined the Air Force, recruiters allegedly promised free lifetime medical care for them and their dependents in exchange for serving 20 years. Plaintiffs contend that their acceptance of this offer and the government's subsequent practice of providing free medical care formed an implied-in-fact contract. In 1995, however, the government implemented TRICARE, a program that

essentially modeled the availability of health care benefits for retirees along the lines of a health maintenance organization ("HMO"). *See* 32 C.F.R. § 199.17. Retired service members who qualify for Medicare under the Social Security Act, however, are not eligible for TRICARE benefits. But TRICARE does allow military retirees over age 65 to maintain the military health coverage that they had previously received for free by paying a monthly Medicare fee, which is deducted from their social security benefit payments.[4] On December 11, 1996, plaintiffs brought a Little Tucker Act action[5] alleging that the government had breached its implied-in-fact contracts by requiring them to pay for Medicare coverage.[6]

Before the district court, the retirees sought "an order requiring the United States to cease deducting payments from their retired pay and to provide [them] and their dependents the unlimited free medical care for which they allegedly contracted." *Schism,* 19 F.Supp.2d at 1289. The retirees argued that the recruiters' authority to make promises of full free lifetime medical care had multiple sources, the clearest being the broad language of 5 U.S.C. § 301 (1958). Under that and oth-er statutes, the military departments promulgated for decades regulations that governed the eligibility of retirees for health care, including Army Regulation AR 40–505 ¶ 2(b)(2) (1934) (allowing use of Army hospitals to Army retirees "provided sufficient accommodations are available for their treatment"), Army Regulation AR 40–590 ¶ 6(b)(1) (1935) (limiting availability of care from Army hospitals to "retired personnel on inactive status" who will benefit "by hospitalization for a reasonable time," not those who "merely" require "domiciliary care by reason of age or chronic invalidism"), and Air Force Regulation AFR 160–73 ¶ 14(h) (1951) (limiting hospitalization of retired Air Force personnel to those "who will be benefited by hospitalization for a reasonable length of time"). In addition, the 1943 edition of the Navy's Manual of the Medical Department ("MEDMAN") also states: "Retired officers and enlisted men, inactive, are not entitled to civilian medical and hospital treatment at government expense. They are entitled to treatment in naval hospitals by naval medical officers when available upon application. . . ." 1943 MEDMAN § 3168. Plaintiffs cite and rely on all these sources.

---

**4.** Medicare Part B is the specific plan that these retirees elected so as to also receive certain physicians' services, home health service, laboratory services, and other services. *See* 42 U.S.C. § 1395k (2000) (explaining Medicare Part B services). It appears the monthly fee paid by the retirees in 1995 was about $45 per person.

**5.** The Little Tucker Act states:
Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978.
28 U.S.C. § 1346(a)(2) (2000).

**6.** The plaintiffs also brought a motion for class certification that was denied by the district court as moot in view of its grant of summary judgment in favor of the government.

1266

In further support for their position, the retirees pointed to a 1945 letter written by James Forrestal, then-Secretary of the Navy, to "Naval Reserve and Temporary USN Officers." The letter encourages reserve officers to transfer to the Regular service. Attached to this letter was a recruitment brochure indicating that retired Navy personnel would receive free medical care. The retirees asserted that this letter explicitly authorized the recruiters' oral promises of free lifetime health care. In a similar vein, they contended that because Congress later expressly authorized certain plans for some retired service members and their dependents, e.g., "CHAMPUS" (Civilian Health and Medical Program of the United States), 10 U.S.C. § 1086 (1966), it also necessarily authorized recruiters' earlier oral promises of free lifetime medical care. Citing the repeated appropriations of funds then used to pay for military medical care, including the care given to retirees, Schism alternatively argued that Congress later ratified the recruiters' promises.[7]

The government responded that none of the military services' regulations in place before 1956 promised free unconditional lifetime medical care for retirees and, moreover, that 5 U.S.C. § 301 did not authorize promises of such care even if the regulations did conditionally authorize care under certain circumstances. Further, the

government argued, Congress did not ratify the recruiters' oral promises because it never explicitly appropriated funds for an entitlement to free lifetime medical care for retirees.

On August 31, 1998, the district court rejected the retirees' claim, holding that as a matter of law neither the relevant statutes nor the regulations authorized the recruiters' promises of full free lifetime medical care. See Schism, 19 F.Supp.2d at 1295. In reaching this conclusion, the court explained that while "recruiters made promises to potential recruits that they could obtain lifetime medical care for themselves and their dependents by joining the armed forces and fulfilling certain service obligations," those promises conflicted with the regulations then in place. Id. Accordingly, the court concluded, because the recruiters lacked the requisite authority to make promises binding on the government, no valid contracts between the retirees and the relevant service branches were formed. Id. Summary judgment was therefore granted in favor of the government.

On February 8, 2001, a panel of this court reversed, stating "[t]here is nothing in the regulations or law prior to 1956 that would have prohibited recruiters from making [the promises of full free lifetime medical care]; indeed those regulations appear to authorize them. At the least,

7. An authorization act is passed every year by both chambers of Congress. In this act, the Congress enumerates, or "authorizes," the activities that may be carried-out by each department. (Other activities may be authorized by permanent legislation.) An appropriations bill, on the other hand, explicitly provides the amount of funding each such activity will receive for that Fiscal Year. In the present case, the retirees cite to authorization and appropriations statutes that provide (among other things):
Army Authorizations:

"... for medical care and treatment of patients when entitled thereto by law, regulation, or contract ... except when elective treatment has been obtained in civilian hospitals...." 58 Stat. 583 (1944).
"... medical and dental care of personnel entitled thereto by law or regulation, and other measures necessary to protect the health of the Army...." 83 Stat. 472 (1969).

there is no inconsistency between them." *Schism v. United States*, 239 F.3d 1280, 1288 (Fed.Cir.2001) (vacated). The full court then granted the government's petition for a rehearing *en banc*, and, by order dated June 13, 2001, asked the parties to rebrief the appeal, addressing (among other things) the following issues: (1) whether promises of free medical care for life are enforceable in general and in particular under 5 U.S.C. § 301; (2) whether congressional appropriations had ratified those promises; and (3) the relevance, if any, of the new TRICARE for Life Bill, enacted in December 2000, Pub.L. No. 106–398, § 712 (2000), the conference report of which states that it "provides permanent lifetime TRICARE eligibility for Medicare-eligible military retirees and their families beginning in fiscal year 2002," 146 Cong. Rec. H9642 (daily ed. Oct. 11, 2000). *Schism v. United States*, 252 F.3d 1354 (Fed.Cir.2001).

On appeal, the retirees contend "the government forced [them] to go on Medicare and pay for their own medical care." Citing the "unavailability of care under Medicare," the retirees explained that they had to pay for Medicare Part B and supplemental insurance. Asserting that paying these fees violated their contract with the government, the retirees are seeking damages. While the nature and extent of these damages are not explained in detail in the briefs, the logical conclusion is that the retirees seek the costs they allegedly have been "forced" to pay "to get less medical care than they were receiving at no cost before [the alleged breach]." Indeed, these are the only damages that the retirees discuss in any detail.

Schism also appeals the district court's order granting the government's motion for a protective order that denied additional discovery until after the court had ruled on the government's summary judgment motion. Adopting the government's assertion that the requested discovery was not necessary to respond to this motion, the district court concluded "the burden and expense of the subject discovery outweighs its likely benefit at this stage of the proceedings." *Schism v. United States*, No. 3:96cv349/RV, Order at 1 (N.D.Fla. Sept. 19, 1997). The district court did indicate, however, that if the government's motion for summary judgment was denied, the government would need to timely respond to the unfulfilled discovery requests. *Id.* at 1–2.

As noted earlier, the plaintiffs' contract claim was brought under the Little Tucker Act, which provides concurrent jurisdiction in the United States district courts and the United States Court of Federal Claims for money claims against the United States founded on (among other sources of law) "any express or implied contract with the United States" that does not exceed $10,000. 28 U.S.C. § 1346(a)(2).

Plaintiffs filed a timely notice of appeal. We have exclusive subject matter jurisdiction under 28 U.S.C. § 1295(a)(2) and now affirm.

## Discussion

We review a district court's grant of summary judgment *de novo*. *See T & M Distribs., Inc. v. United States*, 185 F.3d 1279, 1282 (Fed.Cir.1999). Summary judgment is proper only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For the purposes of this appeal, the government concedes that recruiters made the good faith representa-

tion to potential recruits that, upon retirement, they and their dependents would receive free, lifetime medical care.

## I. Retirement Benefits for Military Personnel, as for Civilian Federal Employees, Are Governed Exclusively by Statute and Therefore May Not Be Granted by Contract

■ Benefits for retired military personnel—and for civilian retired federal employees, for that matter—depend upon an exercise of legislative grace, not upon principles of contract, property, or "takings" law. *See Zucker v. United States,* 758 F.2d 637, 640 (Fed.Cir.1985) (explaining that federal workers' "entitlement to retirement benefits must be determined by reference to the statute[s] and regulations governing these benefits, rather than to ordinary contract principles"); *see also Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961) ("A soldier's entitlement to pay is dependent upon statutory right."); *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 267–68 (1981) ("Thus it has long been held that the rights of civilian and military public employees against the government do not turn on contract doctrines but are matters of legal status even where compacts are made."); *Shaw v. United States,* 226 Ct.Cl. 240, 640 F.2d 1254, 1260 (1981) (stating "the law is well settled that, 'public employment does not, * * * give rise to a contractual relationship in the conventional sense' ") (citations omitted). In other words, Congress—and only Congress—can authorize the benefits that a retired federal employee, whether civilian or military, is entitled to receive. *See Frisbie v. United States,* 157 U.S. 160, 166, 15 S.Ct. 586, 39 L.Ed. 657 (1895) ("Pensions are the bounties of the government, which [C]ongress has the right to give, withhold, distribute,

or recall at its discretion. Congress, being at liberty to give or withhold pensions, may prescribe who shall receive, and determine all the circumstances and conditions under which any application therefore shall be prosecuted. No man has a legal right to a pension.... The whole control of that matter is within the domain of congressional power." (citations omitted)).

## A Congress Has Exercised Its Plenary Authority Over the Military in the Realm of Health Care for Present and Former Military Members and Their Dependents Since 1884 and Has Never Authorized the Secretaries of the Military Departments to Contract With Recruits for Benefits Not Provided for By Statute

■ In a similar vein, Congress has since 1884 repeatedly exercised its authority by enacting statutes that defined the breadth of health care authorized for members of the military and their dependents. *See* 23 Stat. 112 (1884) (authorizing spending for medical care for the dependents of active duty Army personnel when "practicable"). In 1929, for example, Congress authorized medical care for Navy retirees at non-naval hospitals. *See* 45 Stat. 1090 ("[T]he Secretary of the Navy may provide for the care and treatment of naval patients on the active or retired list ... entitled to treatment in naval hospitals in other government hospitals when appropriate naval hospital facilities are not available and the government agencies having control of such other hospitals consent thereto."). In addition, in 1943, Congress acted so as to limit the hospitalization of dependents of active duty Navy members. *See* 57 Stat. 80, 81 (1943) (authorizing hospitalization for dependents of Navy and Marine Corps personnel "only for acute

medical and surgical conditions, exclusive of nervous, mental, or contagious diseases or those requiring domiciliary care").

In 1956, Congress began a series of legislative acts that have formed the basis for modern-day retired military medical care. The three-fold purpose of the medical care program for retirees is best explained by the Department of Defense:

> To provide incentives for armed forces personnel to undertake military service and remain in that service for a full career; to help ensure the availability of physically acceptable and experienced personnel in time of national emergency; and to provide military physicians and dentists exposure to the total spectrum of demographically diverse morbidity necessary to support professional training programs and ensure professional satisfaction for a medical service career.

Office of the Secretary of Defense. United States Department of Defense, *Military Compensation Background Papers: Compensation Elements and Related Manpower Cost Items. Their Purposes and Legislative Backgrounds* at 609 (5th ed.1996). The Dependents' Medical Care Act of 1956, 70 Stat. 250, 253 (1956), ("the 1956 Act") was intended in part "to provide a uniform and improved program of medical care for the dependents of members of the uniformed services." H.R.Rep. No. 84–1805 at 1 (1956). This Act expressly included conditional health care for retirees: "a member or former member of a uniformed service who is entitled to retired ... pay *may,* upon request, be given medical and dental care in any facility of any uniformed service *subject to the availability* of space and facilities and the capabilities of the medical and dental staff." 10 U.S.C. § 1074(b) (1956) (emphases added). Thus, military retirees and their de-

pendents were given "a *contingent right* to care in military medical facilities.... 10 U.S.C. § 1074(b) (retirees) and § 1076(b) (dependents or survivors of retired members)." *Military Compensation Background Papers* at 609 (emphasis added).

A mere ten years later, in 1966, Congress revisited the issue of retiree medical care when it amended the provisions of Title 10 dealing with health care for (among others) retirees and their dependents. In so doing, Congress granted the authority to the Department of Defense to contract for the provision of civilian health care for these groups (resulting in the Civilian Health and Medical Program for the Uniformed Services—CHAMPUS). *Id.* Indeed, in recommending this amendment, the Secretary of Defense explained the need for the legislation in view of there being insufficient space available care for retirees in military facilities:

> The purpose of the proposed legislation is to provide a program of health benefits equally available to all *retired* members of the uniformed services and their dependents. Such a program is required to provide equitable benefits to our rapidly increasing retired population. In future years, these benefits must *increasingly be provided by civilian* institutions due to the declining coverage of space-available care in military facilities.

H.R.Rep. No. 89–1407, at 27 (emphasis added). The House Committee on Armed Services echoed this concern, emphasizing the "moral obligation of the government to provide care in retirement to the military man and his family." *Id.* at 23. Indeed, as recognition of this moral obligation, the Committee substantially agreed with the conclusion of a study commissioned by the Department of Defense that while "the

Government has *no absolute legal obligation* to provide [health care in military facilities,] . . . stated and implied promises of medical care following retirement, both written and oral, . . . were for many years a standard part of personnel recruitment and retention efforts." Military Hospital Construction and Utilization Policies. Report of the Special Subcommittee on Construction of Military Hospital Facilities of the House Committee on Armed Services at 10362 (Sept. 30, 1964) (emphasis added). Thus, Congress was concerned with keeping the promise to provide medical care for retirees and felt that it did so by authorizing a program such as CHAMPUS, which would bring retirees under an insurance program while retaining the concept of space-available care in military facilities for retirees.

CHAMPUS guaranteed retirees who were not yet entitled to Medicare benefits access to authorized health services from civilian sources as an alternative to care from military facilities. *Military Compensation Background Papers*, at 609–10. Of significance is that CHAMPUS was not a "free" program:

> By law, CHAMPUS is a cost-sharing program with the retiree responsible, in the case of outpatient services, for a deductible [which increases over time] . . . together with [a percentage] of all allowed charges for "inpatient care." The Government pays the balance of the allowed charges for authorized care, *i.e.*, 75 percent of the allowed charges, provided that a retiree or a retiree's family group of two or more persons may not be required to pay a total of [an amount which increases over time] for health care received under CHAMPUS during any fiscal year.

10 U.S.C. § 1086(b)(4).

*Id.* (footnote omitted). Thus, because the very program Congress enacted in part for the retirees' benefit was never "free," it is clear that Congress never intended health care for retired career personnel to be without cost to the retirees.

Following yet another examination of health care for retirees, in 1986, Congress enacted 10 U.S.C. §§ 1097, 1099 to further improve the health care system for service members. This legislation provided the authority for the military's eventual implementation of TRICARE in the early 1990s, which offered CHAMPUS-eligible beneficiaries (retirees under 65 years of age) a choice among a health maintenance organization-type program, a preferred provider network program, and CHAMPUS benefits. *See* 10 U.S.C. §§ 1097, 1099 (1986). In order to stimulate enrollment in TRICARE Prime, Congress amended section 1097 in 1996, to provide that "the Secretary shall, as an incentive for enrollment, establish reasonable preferences for services in facilities of the uniformed services for covered beneficiaries enrolled in any program established under, or operating in connection with, any contract under this section." 10 U.S.C. § 1097(c) (Supp. II 1996). Because TRICARE Prime was limited to CHAMPUS-eligible beneficiaries, the priority access requirement had the effect of reducing space-available care for Medicare-eligible (65 years and over) retirees and their dependents. Congress then took steps to ameliorate this effect. For example, in 1997, it enacted the "Medicare subvention demonstration project for military retirees," which provided for Medicare funding of a Department of Defense-sponsored program similar to TRICARE Prime. *See* 42 U.S.C. § 1395ggg (Supp. III 1994). Then, in 1998, Congress acted again, adopting demonstration projects for Medicare-eligible Department of Defense

beneficiaries. *See* National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105–261, §§ 721–723. These projects were the Federal Employees Health Benefits Program Demonstration Project; TRICARE as a Supplement to Medicare; and the Pharmacy Redesign Implementation. Most recently, of course, Congress exercised its authority over health care for retired military members by introducing TRICARE For Life, which provides a pharmacy services program for Medicare-eligible beneficiaries and authorizes Medicare-eligible beneficiaries who enroll in Medicare Part B to participate in CHAMPUS. *See* Pub.L. No. 106–398, § 712 (2000).

While Congress has legislated extensively in the realm of military health care, as the history above indicates, not once has it statutorily authorized the secretaries of the military departments to contract with recruits for health benefit entitlements. *Compare, e.g., California v. United States,* 271 F.3d 1377 (Fed.Cir.2001) (wherein Congress granted the Secretary of the Interior the express authority to contract with the State of California regarding certain water projects); 48 C.F.R. § 1.601 (vesting the "agency head" with express "authority and responsibility to contract for authorized supplies and services" and mandating that only contracting officers may enter into contracts on behalf of the government). Of course, had Congress legislated that the military secretaries could contract with recruits for specific health care benefits, the situation would be different. However, because Congress (1) has enacted statutes for over 100 years that govern the level and availability of health care benefits for active and retired members of the armed services and their dependents; and (2) has never provided funds for contracts made by the secretary with recruits to grant health care, the inescapable conclusion is that Congress simply did not intend to delegate its authority over health care benefits for military members. Rather, it intended to occupy the entire field. In that context, one cannot reasonably infer that by empowering service secretaries to run their respective departments, Congress was silently authorizing them to grant health care benefits via oral promises to recruits by the service's recruiters.

**B The Supreme Court Has Ruled that Military Pay and Benefit Entitlements are Controlled by Statute, Not Contract, as Has Our Court, and These Rulings are Based in Sound and Consistent Logic**

The Supreme Court has recognized the irrelevance of contract law for members of the military many times, stating, for example, that "common-law rules governing private contracts have no place in the area of military pay." *Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961). This is true even though recruiter and recruit may each sign an enlistment contract agreeing to its contents; the recruit's entitlement to basic pay is simply not governed by this contract, but by statute. *See id.* Accordingly, in *Bell,* the Supreme Court determined that even though an enlisted soldier captured in the war had espoused communism, called the President a "traitor," aided his captors as a prisoner of war and thereby allegedly "breached" his enlistment contract, he was still entitled to his basic pay for as long as he was a member of the military. *Id.* at 401–02, 81 S.Ct. 1230. In short, the Court reasoned, the pre-existing statute—not the enlistment contract—governed the soldier's right to basic pay. *Id.* at 402, 81 S.Ct. 1230. And

so even though a soldier "may violate his contract obligations, his status as a soldier is unchanged"; consequently, as a "soldier," he was entitled to all the benefits prescribed by statute, including his statutorily-mandated basic pay. *Id.; see also United States v. Larionoff,* 431 U.S. 864, 869, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (stating in a bonus pay case that, "the rights of the affected service members must be determined by reference to the [relevant statutes and regulations] rather than to ordinary contract principles").

■ The doctrine that statutes are the exclusive source of law governing the compensation rights of members of the military for pensions as well as pay appears in Court opinions as early as 1856. In *Walton v. Cotton,* 60 U.S. 355, 357, 19 How. 355, 15 L.Ed. 658 (1856), the Court explained that to determine who qualifies as beneficiaries of a deceased revolutionary war captain's pension "the case turns upon the construction of [the] statutes" pertaining to the pensions and not upon any other source of law. This understanding also prevails in subsequent cases, with the Court quoting *Walton* as the source for the rule that only congressional acts determine compensation of soldiers. *United States ex re. Burnett v. Teller,* 107 U.S. 64, 68, 2 S.Ct. 39, 27 L.Ed. 352 (1883) ("[military p]ensions are the bounties of the government, which [C]ongress has the right to give, withhold, distribute, or recall at its discretion").[8] *See also Frisbie v. United States,* 157 U.S. 160, 166, 15 S.Ct. 586, 39 L.Ed. 657 (1895) (quoting the same rule as the basis for its analysis that statute, not

contract law, governs the entire administration of military pensions, and further holding that statute supercedes even where third party agents have contracted independently with pension beneficiaries). While the post-*Walton* cases do not offer any independent justification for the doctrine, they are explicit about the statutory source for their decisions and the rejection of other legal bases in their analysis.

■ As mentioned above, this principle that compensation is controlled by statute has been applied specifically to pensions and hospitalization benefits for soldiers, thus, illustrating not only the exclusive role of statutes in determining military personnel's compensation rights, but also touching on rights akin to those claimed by the plaintiffs in this case. In *Lynch v. United States,* 292 U.S. 571, 577, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), the Supreme Court explained that "[p]ensions, compensation allowances, and privileges are gratuities. They involve no agreement of parties; and the grant of them creates no vested right. The benefits conferred by gratuities may be redistributed or withdrawn at any time in the discretion of Congress." *Id.* In so doing, the Court opined that while war-risk insurance resembled pensions, hospitalization and other privileges statutorily afforded to former members of the military, the war-risk insurance differed in that its policies arose not from statutes, but from written contracts. The authority for the program was set forth in congressional action separate from the government's role as the commanding power of the armed forces ("[w]ar risk

---

**8.** The case held that a pensioner was deemed not to be entitled to a general statutory pension in addition to an earlier-created pension ((solely for the particular pensioner's benefit by a special act of Congress) because the second, more general statute would supercede the first statute; no vested rights could be retained from the first statute if the second statute applied).

insurance was devised in the hope that it would, in large measure, avoid the necessity of granting pensions"). *Id.* at 576 n. 2, 54 S.Ct. 840. It was only because of this difference that the war-risk insurance contracts created vested rights, whereas pensions and hospital privileges were mere statutory gratuities, not vested contract rights, so Congress could revoke or expand them at any time. *See id.* at 577, 54 S.Ct. 840; *United States ex rel. Burnett v. Teller,* 107 U.S. 64, 68, 2 S.Ct. 39, 27 L.Ed. 352 (1883) ("No pensioner has a vested legal right to his pension"). Another way to understand why the government's position with respect to obligations incurred by enlistment contracts differs from the contracts at issue in *Lynch* is that, as the Court in *Bell* explains, "[e]nlistment is a contract; but it is one of those contracts which changes in status; * * * [and a soldier's] relations to the State and the public are changed." 366 U.S. at 402, 81 S.Ct. 1230. In *Bell* the soldiers' potential breach was at issue but the rule that the enlistment contract gives rise to a relationship not governed by contract or that the contract somehow merges with the applicable statutes is stated generally and fits with the *Lynch* concept that compensation of soldiers is different from other contracts in which a soldier and the government happen to be contracting parties, but their roles as contracting parties are not relevant to the enlistment or military service context. *Bell,* 366 U.S. at 402, 81 S.Ct. 1230.

■■■ The Supreme Court has not explicitly applied these principles to comprehensive medical benefit entitlements for military retirees or (as in this case) to an asserted implied-in-fact contract grounded on the conceded promises of full free lifetime medical care. In our view, however, full free lifetime medical care is merely a form of pension, a benefit received as deferred compensation upon retirement in lieu of additional cash. *See* Black's Law Dictionary 1134 (6th ed.) (defining "pension" as a "[r]etirement benefit paid regularly (normally monthly), with the amount of such based generally on length of employment and amount of wages or salary of pensioner. Deferred compensation for services rendered."). We see no meaningful difference between the retirement benefits that the Supreme Court has identified as beyond the reach of contracts and the full free medical care at issue in this case and, as a result, will apply the doctrine that was the basis for the earlier Supreme Court cases. The plaintiffs are implicitly claiming not only that the recruiters promised them lifetime, free medical care, and that everyone involved assumed that there would be enough military hospitals and clinics to serve the servicemen at any age, retired or not, but also that there was a contingent promise that if there would ever be an insufficient number of medical facilities, the government would buy civilian health insurance for the servicemen to make up for the deficiency. In other words, the plaintiffs claim a right to comprehensive benefits. Moreover, even if one were to consider the asserted medical benefit entitlement more as bargained-for, direct compensation for services rendered rather than gratuities, because the plaintiffs are military personnel, the vesting of any rights would be governed by statute, rather than by contract as the plaintiffs argue. *See Larionoff,* 431 U.S. at 869 n. 7, 97 S.Ct. 2150 (referring to the limitation that the soldiers' rights to reenlistment bonuses only vested because the statute in question made the soldiers eligible for the statutory bonuses and caused the rights to vest, not because of contract principles.

Contract principles would have engendered a right to a specific amount of money, whereas a statutory bonus is calculated according to a statute and may be more flexible and dependent on multiple variables). The case law shows that where Congress has legislated military pay or benefits, a service secretary cannot contract (even if it may be true that in the absence of congressional action, and with congressional authority, a secretary could have contracted with respect to the pay or benefits). So we must conclude that there were no valid contracts in this case.

■ This conclusion also accords with our own prior decisions and thus preserves stability. Our case law has reiterated the Supreme Court's language that Congress "may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had expected to be able to earn." *Wyatt v. United States,* 2 F.3d 398, 401 (Fed.Cir.1993) (citations omitted); *cf. Andrews v. United States,* 175 Ct.Cl. 561, 563 (1966) (recognizing the "strong authority for the counter-proposition that officers have no vested or contractual right to any particular amount of retired pay") (citing *Bell,* 366 U.S. at 401, 81 S.Ct. 1230). Indeed, we have stated that

> [federal employees'] entitlement to retirement benefits must be determined by reference to the statute and regulations governing these benefits, rather than to ordinary contract principles. [And] [a]pplying th[is] doctrine ... courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel.

9. While the theory of recovery in this case differs from the theory of recovery advanced in *Sebastian,* we emphasize that the panel's

*Zucker v. United States,* 758 F.2d 637, 640 (Fed.Cir.1985). Our court again followed this line of precedent in *Sebastian v. United States,* 185 F.3d 1368 (Fed.Cir.1999).[9] There, elderly military retirees, comparable to plaintiffs here, sought just compensation under the Fifth Amendment's Takings Clause for the government's failure to provide promised free lifetime medical care. *See id.* at 1370. Adopting the settled principle that the right to military pay "must be determined by reference to the [governing] statutes and regulations ... rather than to ordinary contract principles," and applying it to retirement benefits, including medical care, our analysis "look[ed] to the *governing statutes and regulations* to ascertain whether the Retirees have an unconditional right to lifetime free medical care." *Id.* at 1371 (citations omitted) (emphasis added); *see also Goodley v. United States,* 194 Ct.Cl. 829, 441 F.2d 1175, 1178 (1971) (explaining that for a Navy reservist "there is no vested or contractual right to retired pay, which is dependent upon statutory right rather than upon common law rules governing private contracts"); *Pate v. United States,* 78 Ct.Cl. 395, 400 (1933) ("Retirement pay and compensation for injuries received in line of duty, like pensions are bounties of the Government, which Congress has the right to give, withhold, distribute, or recall, at its discretion.") (citations and internal quotation marks omitted).

■ In addition, Congress could hardly have intended a contract regime for military health benefits because that would have been inconsistent with the entire system for compensating all federal employees. Federal employees, both military and

analysis concerning the inapplicability of contract law was the same and, we think, correct.

civilian, serve by appointment, not contract, and their rights to compensation are a matter of "legal status" even where recruitment agreements are made. *See Zucker,* 758 F.2d at 640; *see also Chu v. United States,* 773 F.2d 1226, 1227–28 (Fed.Cir.1985) (discussing the plight of Reserve Officers in the Commissioned Corps of the Public Health Service who alleged a breach of contract by the government of its agreement to provide residency training at its expense and stating "[it is a] well-established principle that, absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government"). "In other words, [federal employees'] entitlement to retirement benefits must be determined by reference to the statute and regulations governing these benefits rather than to ordinary contract principles." *Zucker,* 758 F.2d at 640. This logically follows from the well-established principle that

> "public employment does not, * * * give rise to a contractual relationship in the conventional sense." Therefore, plaintiff may not base his theory of recovery on contract law since he was a federal employee. Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not *ipso facto* create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government.

*Shaw v. United States,* 226 Ct.Cl. 240, 640 F.2d 1254, 1260 (1981) (citations omitted).

Adhering to our own long-standing precedent and clear guidance from Supreme Court decisions, then, the plaintiffs' claim for breach of an implied-in-fact contract for retirement health benefits is defeated by the principle that statutes govern entitlement to these benefits, not any contracts between the recruit and the government.[10]

## C Cases Finding an Enforceable Contract Between the Service and a Recruit, *e.g.,* a Promise for Specific Military Training, Are Inapplicable to Retirement Health Care Entitlements

While the Supreme Court has made clear that "common-law rules governing private contracts have no place in the area of military pay," *Bell,* 366 U.S at 401, 81 S.Ct. 1230, our predecessor court enforced contract claims based on enlistment agreements specifying non-pay benefits promised in writing to recruits. *See, e.g., Grulke v. United States,* 228 Ct.Cl. 720 (1981); *DeCrane v. United States,* 231 Ct. Cl. 951 (1982). In these cases, the recruits alleged that the government breached the written and signed enlistment agreements which promised them specific training or duty assignment. In contrast to *Bell,* these cases do not involve military pay or retirement benefits. Thus, *Grulke* and *DeCrane* are not in conflict with established Supreme Court case law that military pay and pay-related benefits cannot ever be a matter of contract, but must be governed exclusively by statutes and regulations.

In *Grulke,* the plaintiff-nurse enlisted in the Army pursuant to regulations that allowed her to select the nature and duration of the specialized medical training she

---

10. The principle of the *Bell* line of Supreme Court cases may also be one of the principles reflected in 5 U.S.C. § 70. *See* note 12, *infra.*

wanted following her basic military training. She chose training as an operating room specialist. Subsequently, however, Grulke exercised her option to receive a voluntary discharge after becoming pregnant, thus prematurely concluding her military service. She later sued, alleging that the six weeks of training she received as an operating room specialist was short of the 18 weeks of training promised to her in her enlistment agreement that was based on and authorized by the regulations. *Grulke*, 228 Ct.Cl. at 721–22. Finding that Grulke's enlistment contract was enforceable, the Court of Claims took pains to distinguish her case from those in which the plaintiff claimed a "right to payment for military services rendered which would be governed by statute or regulation." *Id.* at 722. The court explained that rather than seeking pay afforded by statute but withheld, Grulke was actually claiming a right "for 'actual, compensatory, special and punitive damage,' for breach of contract." *Id.*

In *DeCrane*, our predecessor court again found that contract law could govern in the context of executed enlistment agreements when former servicemen sought damages based on the government's failure to give them the training they had been promised upon enlistment. 231 Ct.Cl. at 952. The court's terse, two-page opinion largely adopted the analysis of *Grulke*. *See id.* ("In at least three prior cases we have rejected the government's argument that we have no jurisdiction over a suit claiming that the government breached an enlistment contract because it failed to provide the training it allegedly promised the serviceman he would receive. We discussed the issue fully in *Grulke*.") (citations omitted).

Accordingly, Congress' authority and the various courts' (*i.e.,* the Supreme Court, our court, and our predecessor court) consistent interpretation thereof demonstrate that military health care benefits as a form of compensation have long been exclusively a creature of statute, not contract. Consequently, the discussions with recruiters could not have formed binding contracts with the government at the time Schism and Reinlie joined the Air Force. Their claim for breach of an implied-in-fact contract that would give them both an entitlement to lifetime free medical care at military facilities and an entitlement to civilian health insurance for any insufficiency in those military facilities must fail as a matter of law.

On this basis alone, we could dispose of this appeal. To respond to the plaintiffs' contract-based arguments, however, we address below why their claim must fail even assuming that contracts could govern the asserted entitlement to medical benefits for military retirees and their dependents.

## II. Even Assuming a Contract Law Analysis Were Proper, Plaintiffs Still Do Not Have a Valid Contract Because the Recruiters Lacked Actual Authority to Negotiate Entitlements for Full, Free Lifetime Health Care Benefits

As explained above, the retirees' claim is foreclosed by the principle, well established by Supreme Court precedent, that federal retirement benefits such as health care are creatures strictly of legislative grace and thus cannot be granted by contract. Even assuming that a contract analysis were appropriate, however, the retirees' claim still cannot withstand summary judgment because the Supreme Court has likewise made clear that the sole statute relied on by the plaintiffs, 5 U.S.C.

§ 301, authorizes only "housekeeping" matters like internal policies and procedures; it thus cannot authorize the creation of a benefit entitlement via contracts.

As stated earlier, plaintiffs seek to recover solely upon a theory alleging breach of an implied-in-fact contract, asserting that the necessity they pay Medicare and premiums, along with those for supplemental insurance in order to have full health care coverage, breached the promise of full and free lifetime healthcare.[11]

Despite the thorough briefing in this case, plaintiffs never specify exactly what was included within the broad promise to them. Both sides agree that the retirees were promised "free lifetime medical care." *See, e.g.,* Complaint at 2 ("That all of the World War II and Korean class veterans were promised *full* post retirement medical care for themselves and their dependents in military hospitals.") (emphasis added); Appellants' Brief at 1 ("[T]he recruiters promised them free lifetime medical care if they served at least twenty years."); Appellee's Brief at 2 ("Plaintiffs ... filed an action contending that the government induced them to serve in the military with the promise that, upon retirement, they and their dependents would be entitled to free, lifetime medical care."); Appellants' Reply Brief at 2 ("By instituting Tri–Care, the government breached its implied contract to provide Schism and Reinlie with free medical care for life."). What that promise encompasses, however, the retirees never explicitly articulate. Several times the retirees have referred to seeking care only in mili-

tary facilities. *See, e.g.,* First Amended Complaint at 2. If this was the extent of the promise, we fail to see how it was breached at all. Indeed, retired military members, regardless of age, were still entitled to free medical treatment at military facilities on a space-available basis after the implementation of Tricare in 1995. *See* 32 C.F.R. § 199.17(f)(1) (1995) ("Military Treatment Facility (MTF) care. All nonenrollees (including beneficiaries not eligible to enroll) continue to be eligible to receive care in military treatment facilities on a space available basis.") *Military Compensation Background Papers* at 613 ("Even after they become eligible for Social Security hospital insurance benefits, retirees, their dependents, and survivors may receive treatment at military medical facilities on a space-available basis."); *Tricare Demonstrations Manual* 1992 ("These dual-eligible beneficiaries [eligible for both Medicare and Military Health Services] do not have a Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) entitlement, but are eligible for care in a [Military Treatment Facility] on a space-available basis."). Retirees were not required to purchase Medicare Part B in order to continue to receive medical treatment from military facilities on a space-available basis. Because medical care remains available at military facilities on a space available basis, the only logical conclusion is that the promised "full," free lifetime medical care meant that if space was no longer available at base hospitals, as alleged, then Congress was bound by the contracts to pay for health insurance coverage for care by civil-

---

**11.** Specifically, the plaintiffs allege that the United States breached its contract with the plaintiffs "by revoking or limiting access to military hospitals, in-patient and out-patient care, and medicines to plaintiffs and those elderly retired veterans to the point that Plaintiffs have no care, or are denied the care and free medications they were promised," First Amended Complaint at 3, and they did not surrender this position in their briefs to this court or at oral argument.

ian doctors. That is, "free care" meant the retirees, even when over 65 years of age and entitled only to hospitalization insurance coverage under Medicare Part A (unpaid), would not have to spend their own money to pay for care from civilian doctors. Similarly, as to medications, once they were no longer provided free at base hospitals and clinics, then Congress was bound to pay for insurance coverage so that when ordered at civilian pharmacies, the medications would be free.

A binding implied-in-fact contract arises between a private party and the government upon proof by the person of: (1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government's representative to bind the government. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998). As to "actual authority," the Supreme Court has recognized that any private party entering into a contract with the government assumes the risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *accord CACI, Inc. v. Stone, Sec'y of the Army*, 990 F.2d 1233, 1236 (Fed.Cir.1993) ("A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself was unaware of the limitations on his authority."). In this case, the thrust of the parties' arguments is that under § 301 the Air Force recruiters had actual authority to bind the government with their oral promises. *See, e.g., Fed. Crop Ins. Corp.*, 332 U.S. at 384, 68 S.Ct. 1 (explaining that a government representative's authority

can be "explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power."). We hold they did not.

## A Plaintiffs' Written Enlistment Contracts Preclude Implied–in–Fact Contracts Based on Oral Promises

We note at the outset that the retirees' implied-in-fact contract argument fails to take into account their written enlistment agreements. It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract. *E.g., Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed.Cir.1990). Along those same lines, no citation is necessary to support the vitality of the parol evidence rule: barring certain limited exceptions (*e.g.,* fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself.

As discussed above, Reinlie and Schism agreed in an express, written contract to be bound by military regulations and statutes. Those regulations and statutes expressly address health care for military retirees, and provide expressly that retirees and their dependents were not entitled to full free lifetime medical care. Accordingly, the retirees' contract claim is foreclosed because an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Trauma Service Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997).

## B 5 U.S.C. § 301 Did Not Authorize the Secretary to Grant an Entitlement to Full Free Lifetime Medical Care for Retirees

Even assuming that retirement benefits for veterans did not depend on

legislative grace, Schism's argument that 5 U.S.C. § 301 supplied the requisite authority for these health care entitlements still cannot avoid summary judgment. Plaintiffs argue that the broad language of 5 U.S.C. § 301 conferred authority on the secretaries of the military departments to control recruitment in their departments, which included directing recruiters to promise free lifetime medical care. The government responds that 5 U.S.C. § 301 is merely a "housekeeping" statute that does not authorize the creation of a substantive right such as an "entitlement to free lifetime medical care." Accordingly, the issue turns on whether 5 U.S.C. § 301 impliedly authorized military recruiters to promise free lifetime health care at the time. We agree with the government's interpretation of the statute and hold that it does not.

■■■ 5 U.S.C. § 301 states in relevant part:

Departmental regulations

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property.

This statute is discussed in greatest detail in *Chrysler Corp. v. Brown*, 441 U.S. 281, 309, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), where the Supreme Court described it as a "housekeeping statute." The key point about this understanding of § 301 is that it predates the recruitment period of the early 1950s. The Court recognized that the "antecedents of § 301 go back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs. Those laws were consolidated into one statute in 1874, even though the current version of the statute was enacted in 1958." *Id.* at 309, 99 S.Ct. 1705. And so, said the Court, "[g]iven this long and relatively uncontroversial history, and the terms of the statute itself, [5 U.S.C. § 301] seems to be simply a grant of authority to the agency to regulate its own affairs. * * * It is indeed a *'housekeeping statute,'* authorizing what the APA terms *'rules of agency organization procedure or practice'* as opposed to *'substantive rules.'*" *Id.* at 309–10, 99 S.Ct. 1705 (emphases added). *See also Sebastian v. United States*, 185 F.3d 1368, 1371 (Fed.Cir.1999) (noting the Supreme Court's view of 5 U.S.C. § 301 as merely a "housekeeping statute" and concluding that the statute did not authorize the government to promise and provide free lifetime medical care for retired veterans); *United States v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255 (8th Cir.1998) (noting that Congress had looked carefully at § 301 in 1958 and the subcommittee had " 'unanimously agreed that [§ 301] originally was adopted in 1789 to provide for the day-to-day office housekeeping in the Government departments,' and that attempts to construe it as something more was 'misuse' that 'twisted' the statute") (quoting H.R.Rep. No. 85–1461, at 7 (1958); *United States v. Am. Prod. Indus., Inc.*, 58 F.3d 404, 407 (9th Cir.1995)) ("5 U.S.C. § 301, has been deemed by the Supreme Court to be a 'housekeeping statute' "); *Smith v. Cromer*, 159 F.3d 875, 878 (4th Cir.1998) (same); *United States v. Henson*, 123 F.3d 1226, 1237 (9th Cir.1997) (same); *Houston Bus. Journal, Inc. v. Office of the Comptroller of Currency, United States Dep't of Treasury*, 86 F.3d 1208, 1210 (D.C.Cir.1996) (same); *General Mo-*

tors Corp. v. Marshall, 654 F.2d 294, 295 (4th Cir.1981) (same); Parkridge Hosp., Inc. v. Califano, 625 F.2d 719, 721 (6th Cir.1980) (same); In re Bankers Trust Co., 61 F.3d 465, 470 (6th Cir.1995) (same); Davis Enters. v. United States Envt'l Prot. Agency, 877 F.2d 1181, 1184 (3d Cir.1989) ("The EPA's authority to govern its internal affairs is derived from 5 U.S.C. § 301...."); Chasse v. Chasen, 595 F.2d 59, 62 (1979) (opining that three statutes, including 5 U.S.C. § 301, did not provide "statutory authority to issue a policy pronouncement ... which would create a right enforceable in federal court"); H.R.Rep. No. 85–1416, at 1 (1958) ("The law has been called an office 'housekeeping' statute, enacted to help General Washington get his administration underway by spelling out the authority for executive officials to set up offices and file government documents"); United States v. George, 228 U.S. 14, 20, 33 S.Ct. 412, 57 L.Ed. 712 (1913) (concluding that a group of statutes, including a predecessor to 5 U.S.C. § 301, "confer administrative power only").

Therefore, not only does § 301 merely authorize "housekeeping," but also there is no way that it could have been reasonably believed *at that time* that it did more than that. A reasonable lawyer advising the Secretary of Defense or any of the service secretaries at the time could not have claimed that § 301 created the right to make promises of lifetime health care (beyond space available care) because there were other statutes controlling retiree care at the time. *See* 23 Stat. 112 (1884) (authorizing spending for medical care for the dependents of active duty Army personnel when "practicable"); 45 Stat. 1090 (1929) (authorizing medical care for Navy retirees at non-naval hospitals when naval hospital facilities are not available and the relevant

government agencies consent); 57 Stat. 80, 81 (1943) (authorizing hospitalization for dependents of Navy and Marine Corps personnel "only for acute medical and surgical conditions, exclusive of nervous, mental, or contagious diseases or those requiring domiciliary care").

Of course, the language explaining § 301 merely begs the question: what does a "housekeeping" statute authorize? Whatever else it may allow, the Supreme Court made clear in *Chrysler* that § 301 does not alone provide for the creation of rights, consistent with the principles discussed above that only statutes may determine a federal employee's pay and benefits. *Chrysler* involved a "reverse" Freedom of Information Act ("FOIA") claim where a private party sought to enjoin agency disclosure of confidential records on the ground that it conflicted with the FOIA and the Trade Secrets Act. 441 U.S. at 285, 99 S.Ct. 1705. Section 301 was relevant to the case because in order for employees of a government agency to avoid criminal sanctions for disclosing certain classes of information submitted to a government agency, including trade secrets and confidential statistical data, the disclosure must be "authorized by law." 18 U.S.C. § 1905. The agency argued in *Chrysler* that § 301 was the requisite authorization by law that permitted them to disclose what would otherwise have fallen under the Trade Secrets Act. 441 U.S. at 308–09, 99 S.Ct. 1705. The Supreme Court directly contradicted the argument and said § 301 provided no such authority because § 301 authorized no substantive rulemaking. *Id.* at 310, 99 S.Ct. 1705. While the decision focused on the second sentence of § 301 ("This section does not authorize withholding information from the public or limiting the availability of records to the public."), the Court did not limit its

analysis to that sentence only. To the contrary, the Court consistently referred to the statute as a whole in its analysis. *See id.* at 281, 99 S.Ct. 1705.

It seems clear to us that § 301 merely empowers an agency, in this case a military department, to regulate its day-to-day internal operations. But a housekeeping statute that authorizes rules of agency organization, procedure or practice and not substantive rules cannot confer a right to, or otherwise authorize the promise of a right or entitlement to, free lifetime medical care. Indeed, the Court stated in *Chrysler* that "substantive" rules referred to rules "affecting individual rights and obligations." *Id.* at 302, 99 S.Ct. 1705. So, saying that § 301 could by itself vest service secretaries and their recruiters with the authority to make binding promises of lifetime free medical care would in effect mean that, contrary to the Supreme Court's interpretation, § 301 could alone serve as the basis, for the creation of such substantive rights. As more fully explained below, we simply cannot read § 301 as conferring that authority.

**1 Despite § 301's Role In Earlier Health Care for Retirees, It Cannot Authorize Service Secretaries to Grant Full Free Lifetime Medical Care**

Plaintiffs assert that because the government has conceded that § 301 is the statute that authorized early health care plans for military retirees, those which require space availability in order for a retiree to receive health care, it logically follows that § 301 also authorizes a guarantee of full free lifetime medical care as an inducement to recruits. According to the retirees, there is no basis for a distinction between the authority necessary for the two types of medical care programs.

The government admits that 5 U.S.C. § 301 and "its precursors authorized appropriate military officials to prescribe rules that allowed retirees and their dependents to receive free medical care in *existing* military facilities on a *space available* basis." (emphases added). *See* AR 40–505 ¶ 2(b)(2) (1934) (allowing use of Army hospitals to Army retirees "provided sufficient accommodations are available for their treatment"); AR 40–590 ¶ 6(b)(1) (1935) (limiting availability of care from Army hospitals to "retired personnel on inactive status" who will benefit "by hospitalization for a reasonable time," not those who "merely" require "domiciliary care by reason of age or chronic invalidism"); Air Force Regulation AFR 160–73 ¶ 14(h) (1951) (limiting hospitalization of retired Air Force personnel to those "who will be benefited by hospitalization for a reasonable length of time"); 1943 MEDMAN § 3168 (stating "Retired officers and enlisted men, inactive, are not entitled to civilian medical and hospital treatment at Government expense. They are entitled to treatment in naval hospitals by naval medical officers when available upon application. . . ."). But we agree with the government that a crucial difference exists between the conditional care that § 301 and derivative regulations actually provided for and the entitlement that the retirees assert. Simply put, the earlier health care programs for retirees provided free health care only on a *space-available* basis. By contrast, the asserted absolute promise of free lifetime medical care would create an *entitlement* to health care. While § 301 authorizes a military department to prescribe administrative "regulations for the government of [its] department[s] . . . and the custody [and] use . . . of . . . [its] property," 5 U.S.C. § 301, that language plainly does not encompass the power to grant

an entitlement—an unconditioned, non-discretionary legal right to money. *See* Black's Law Dictionary 532 (6th ed.1990) (defining "entitlement" as a "[right] to benefits, income or property which may not be abridged without due process").

We consider sympathetically the veterans' position that, because § 301 authorizes one type of health care, it necessarily authorizes another. But that position ultimately fails because of the important distinction between what each health care plan guarantees a retired veteran, as well as the additional statutory authority explicitly providing for conditional medical care. First, we agree with the government that 5 U.S.C. § 301 did not independently authorize CHAMPUS-type benefits for retirees. Rather, 10 U.S.C. § 1086, enacted in 1966, provided the Department of Defense with broad, explicit, and exclusive authority for providing these benefits to retirees. *See* 10 U.S.C. § 1086 (establishing the authority for the Department of Defense to contract for health insurance for retirees under the same basis established ten years earlier for active duty dependents by 10 U.S.C. § 1079 and further providing that a person who was entitled to Medicare insurance would not be eligible for the insurance program established for retirees, except for those benefits established under the Department of Defense programs that were not covered by Medicare). Thus, the government's argument continues, § 301's function is to provide supplemental authority in recognition of the agency's decision to implement CHAMPUS through the Code of Federal Regulations, rather than solely through the statutory authority to contract for health care services. Indeed, such reliance on 5 U.S.C. § 301 is not obscure, as it is often cited in the Code of Federal Regulations, frequently in conjunction with other statutes, as authority for regulations appearing in the C.F.R. *See, e.g.*, 19 C.F.R. § 351 (identifying 5 U.S.C. § 301 (among other statutes) as the source of the regulation's authority). This position is also consistent with the Supreme Court's interpretation of § 301 as discussed above.

Even if we accepted the position that 5 U.S.C. § 301 alone provided statutory authority for health care insurance for retirees on a space-available basis, we still would reach the same conclusion: 5 U.S.C. § 301 does not authorize full free lifetime health care for retirees. First, § 301 never mentions health care benefits at all. Second, § 301 only deals with an agency's internal governance. Permitting retirees to seek health care from a pre-existing facility with available and otherwise unengaged staff is simply managing an agency's existing resources. On the other hand, granting a lifetime entitlement to health care obligates an agency to call in additional staff or to create additional space whenever a retiree seeks care, or to pay for civilian care. In other words, it goes beyond mere internal or housekeeping matters and creates substantive entitlements giving rise to judicially enforceable rights. Thus, with the earlier health care plans and regulations, the government guaranteed nothing as a matter of right; a retiree only received care on a space-available basis and, even then only if the commander of the hospital approved it. Under the promises made by the recruiters, however, the retirees claim a right to free treatment regardless of the availability of money, space, or medical personnel. The two scenarios are distinct: one is contingent and the other is absolute. An entitlement is an unconditional grant; it is a permanent, non-discretionary right. The differences between the two types of health care programs are clear, and they are dispositive.

A further indicator that 5 U.S.C. § 301 did not authorize full free medical care for military retirees is Congress' treatment of the subject. If § 301 contained the requisite authority for health care for military retirees, no further legislation would have been necessary. As explained above, however, Congress has repeatedly legislated—including in 1956, 1966, and 1986—to provide health care insurance coverage for retired military members. Even more important to the present case, every time that Congress dealt with the retirees (starting in 1960), it enacted legislation that authorized only conditional health care coverage for retirees—that is, care provided only on a space-available basis. *See, e.g.,* 10 U.S.C. § 1086 (1966). Given that Congress repeatedly legislated for conditional health care, it would be illogical to conclude that § 301 would cover full health care absent further congressional action.

Similarly, interpreting § 301 to authorize the recruiters' promises of full free lifetime medical care would be unreasonable when viewed in light of other statutes. For example, 5 U.S.C. § 70 [12] and the Anti–Deficiency Act [13] placed preconditions on obligating or spending appropriated funds. In effect, these two statutes limited both what the recruiter could promise and what the military member could receive. The recruiter, an officer or employee of the United States government, arguably could not obligate the government to spend monies that had not yet been appropriated unless such contract or obligation was authorized by law. And retired military members, because their salary, pay or emoluments were fixed by statute or regulation, could not receive any additional pay or other additional compensation unless it was both authorized by law and the appropriation therefore explicitly states that it is for such additional pay, extra allowance, or compensation. To decide this appeal, we need not define the exact contours of 5 U.S.C. § 301. What is

---

12. 5 U.S.C. § 70 (1946) (now codified as amended at 5 U.S.C. § 5536 (2000), § 70 at the time relevant to this case) concerns the receipt of any pay, extra allowance, or other compensation by a federal employee in exchange for any service in addition to his fixed salary, pay; or emoluments:

> § 70. Extra Allowances
> No officer in any branch of the public service, or any other person *whose salary, pay or emoluments are fixed by law or regulations,* shall receive any additional pay, extra allowance, or compensation, in any form whatever, for the disbursement of public money, or for any other service or duty whatever, unless the same is authorized by law, and *the appropriation therefore explicitly states that it is for such additional pay, extra allowance, or compensation.*

5 U.S.C. § 70 (1946) (emphases added). It should be noted that we do not purport to decide whether § 70 would provide independent grounds for our holding in this case although it appears that § 70 may do so. We confine our decision to relying on § 301 because our interpretation of § 301 compels our

holding and the applicability of § 70 was neither relied on by the district court, nor briefed to us by either party.

13. Later known as the Anti–Deficiency Act, the Act of Sept. 6, 1950, Pub.L. No. 81–759, ch. 896 § 1211, 64 Stat. 595, 765 (amending R.S. § 3679 (1878)) (now codified as amended as the Anti–Deficiency Act, 31 U.S.C. § 1341 (2000)), provided, *inter alia,* at the time of the alleged promises in this case that:

> (a) No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any *contract* or other obligation, for the payment of money for any purpose, *in advance* of *appropriations* made for such purpose, *unless* such contract or obligation is *authorized by law.* ...

§ 1211, 64 Stat. at 765 (emphases added).

clear is that its scope is not broad enough to have provided authority to contract with recruits to the military for free lifetime medical care so as to bind both the Department of Defense and the Congress. And while we do not independently base our decision in this case on 5 U.S.C. § 70 or the Anti–Deficiency Act, we note plaintiffs' interpretation of § 301 as broad enough to have authorized the recruiters to create a binding contract is in considerable tension, if not conflict, with the language of 5 U.S.C. § 70 and the Anti–Deficiency Act. So although we need not and do not decide the independent applicability of 5 U.S.C. § 70 or the Anti–Deficiency Act, we do decide that, in light of those two statutes, § 301 cannot be construed as broadly as the plaintiffs argue.

Finally, the plaintiffs have submitted evidence showing that the promises of free lifetime health care were made by recruiters and that the recruiters were, in fact, encouraged by superiors to tell potential recruits of this benefit. *See, e.g.,* Pentecost Aff. at 1 (Oct. 21, 1997). The plaintiffs also provided excerpts from the *Bluejackets Manual* and the *Soldier's Guide* handbooks given to the members of the United States Navy and Army, for example, as well as various recruitment brochures from the military departments, including one attached to the earlier-mentioned letter from Secretary Forrestal. This evidence, plaintiffs argue, implies that retired members with 20 or more years' active duty did have and do have the unconditional right to receive free lifetime health care.

In our view, the evidence showing that recruiters had made these promises in good faith to retirees like Schism would likely be sufficient to avoid summary judgment—if the Congress had granted the authority to make these promises in the first place. Unfortunately for plaintiffs, however, Congress has never authorized these promises.[14] While we are sympathetic to the plaintiffs' position and acknowledge the likelihood that plaintiffs believed these promises and relied on them, the government is not legally bound to abide by them. The recruiters lacked actual authority, meaning the parties never formed a valid, binding contract. *Cf. Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 416–17, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (holding that erroneous advice given to a federal employee by OPM personnel did not create an estoppel when finding to the contrary would violate the principle "that payments of money from the Federal Treasury are limited to those authorized by statute.").

**2 Air Force and Other Military Regulations Promulgated Under § 301 Did Not Create an Entitlement to Free Lifetime Medical Care; On the Contrary, They Clearly Call for Only Space–Available Military Medical Care for Retirees and Made No Provision for Insurance**

The plaintiffs also argue that the regulations in force at the time they joined the Air Force authorized the recruiters' promises of free lifetime medical care. The implication of this argument seems to be that the regulations themselves provided for the grant of an entitlement to free lifetime medical care. We disagree.

First and foremost, a regulation promulgated under the auspices of 5

---

**14.** In *Sebastian,* our court likewise examined 5 U.S.C. § 301 and determined that because it "stated nothing about health care," *id.* at

1371, it could not provide authorization for the recruiters' promises of free lifetime medical care.

U.S.C. § 301 cannot convey or authorize an entitlement unless that statute clearly so provided, for example, by delegating power to the secretary of the military departments to contract any type of health care for retirees. Simply put, an agency cannot do by regulation what the applicable statute itself does not authorize. *See, e.g., Larionoff,* 431 U.S. at 873, 97 S.Ct. 2150 (stating that "in order to be valid[,] [regulations] must be consistent with the statute under which they are promulgated" and holding that even though the agency's interpretation of the relevant regulations governing military bonuses was reasonable, because the regulations were contrary to the purposes of Congress in enacting the bonus statute itself, the regulations were invalid).

Putting aside for the moment that 5 U.S.C. § 301 did not authorize these promises, directly or by delegation, and also whether they could be extended solely by force of regulation, we address the specific regulations promulgated by the Secretary of the Air Force that dealt with health care for retired members. It is clear from the language of these regulations that they are consistent only with the conclusion that plaintiffs were never granted an entitlement. Indeed, the regulations themselves expressly provided for medical care for military retirees only as space was available.

Plaintiffs in this case served in more than one branch of the Armed Forces, but both Schism's and Reinlie's last and dis-

positive service was in the Air Force. It is the plaintiffs' indefinite appointments to the Air Force that led to their service in the military for more than 20 years. Accordingly, as the government argues (and the plaintiffs do not dispute), the date of each retiree's indefinite appointment is the critical date for determining what was promised. Thus, the regulations pertinent to these veterans are the 1951 Air Force regulations for Schism and the 1953 Air Force regulations for Reinlie. Because whatever promises they were made relevant to this recruitment resulted in their continued service until they performed at least 20 years' active duty, any promise, regulation or material after this time is irrelevant.[15]

In his affidavit, Schism described what he was told regarding free lifetime medical care in the Air Force:

> I learned that the USAF [United States Air Force] made the same promises as the Navy [that he was entitled to] lifetime free medical [care] after retirement. I received official briefing in the Air Force from my commanders or superiors on lifetime medical care, and learned that free lifetime care was common knowledge and 'gospel' in the Air Force.

(Schism Aff. ¶¶ 2, 5.) He also explained that he decided on a career in the Air Force because "it was the best offer around.... [A]nd free medical care then and in the future had a significant value to me just as it does now." (*Id.* at ¶ 6.)

---

**15.** This, obviously, includes the 1945 one-page letter signed by the Secretary of the Navy that was addressed to "Reserve and Temporary USN Officers." This letter was not only drafted too early to apply to the veterans in this case, but it also applied to a class of people which did not include the plaintiffs: the plaintiffs were never temporary or reserve Naval officers. Further, none of the various other military publications submitted by the retirees, such as the Navy's *Blue Jacket Manual;* the Army's *Soldier's Guide;* and general recruiting brochures, state that an Air Force retiree was to receive *full, free, lifetime* health care in 1951 and 1953.

Reinlie recalls similar briefings and reliance thereon from that time period as well:

> I hear[d] recruiting promises of 20 year retirement and lifetime free medical care from ... the U.S. Air Force after 1948.... During the transition from the active reserve to active duty status I was briefed on the conditions of my being recalled and of the benefits of making the U.S. Air Force a career. Stress was placed equally of [sic] my promotional prospects and the retirement program with its free medical benefits.... [About one year later] I was briefed [again] on the advantages of making the service a career ... [and again] my promotional advantages plus the 20 years or more retirement and the free medical treatment available to me and my dependents [were stressed equally]. Already, I had two children and could clearly visualize the advantages of making the Air Force a career. My civilian employer had neither a retirement or medical program. Inasmuch as I enjoyed my work, making the decision to stay was quite easy.

(Reinlie Aff. 1–2.) As explained earlier, the government conceded for the purposes of the present summary judgment motion that the asserted promises were made by plaintiffs' recruiters, made in good faith, and relied upon. But even if the Secretary of the Air Force himself had said to the recruiters that they could and should promise free lifetime medical care to aid in recruitment, those promises would be a nullity because, as shown below, the pertinent regulation provided to the contrary: the retirees claim they were promised an "entitlement," but the regulations provided for space-available care only. *See* AFR 160–73; *see also Hercules, Inc. v. United States,* 516 U.S. 417, 429–30, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (explaining that if there existed an implied agreement that the government would indemnify the suppliers of Agent Orange, that agreement would render unnecessary the entire class of statutes and regulations that set forth the conditions in which a government contracting officer could enter into an indemnity agreement; the Court would "not interpret [the contract] so as to render those statutes and regulations superfluous").

Air Force regulation AFR 160–73 was in effect from 1951 when Schism received his indefinite appointment until after Reinlie received his appointment in 1953. The language of this regulation makes clear that medical care for Air Force retirees was contingent, just as the government argues: "[t]he hospitalization of retired inactive Armed Forces personnel ... *will be limited to cases in which in the judgment of the hospital commander* will be benefited by hospitalization for a reasonable time.... Those requiring merely domiciliary care by reason of age or chronic invalidism will not be admitted." AFR 160–73 ¶ 6(h) (emphasis added). The care is subject to two express conditions. Free medical care for retirees therefore cannot be an absolute entitlement under this regulation. Thus, even viewing the pertinent regulation in isolation, the recruiters' promises of free lifetime medical care were inconsistent with the regulation. As such, the government is not bound by those promises. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. 1 (explaining that the government cannot be bound by statements made by its representative if those statements are outside the bounds of the authority that the Congress conferred).

Likewise, even if regulations from other service branches were relevant, which they are not, no regulations in place when the plaintiffs joined the Air Force provided for an entitlement to free lifetime medical care; the regulations provide only for con-

tingent care, principally based on availability. Moreover, the manuals and brochures did not describe an entitlement, either. For example, the 1942 and 1943 editions of the Navy's MEDMAN, relied on by plaintiffs, state "Retired officers and enlisted men, inactive, *are not entitled* to civilian medical and hospital treatment *at Government expense.* They are entitled to treatment in naval hospitals by naval medical officers *when available* upon application...." 1943 MEDMAN § 3168 (emphases added).[16] This language clearly does not recognize a true entitlement; on the contrary, it acknowledges that retired Navy personnel may receive free military medical care only if space is available.

The Army and Air Force regulations in effect before 1951 similarly contained conditional language. For example, former Army Regulation 40–505 ¶ 2(b)(2) stated "[T]he Army will, usually through its own facilities, provide medical attendance to ... [p]ersons who are on the retired list of the Regular Army and who report in person at any Army dispensary or hospital, *provided sufficient accommodations are available* for their treatment." AR 40–505 ¶ 2(b)(2) (emphasis added). And Army Regulation 40–590 ¶ 6(b)(1) limited "[t]he admission of retired personnel on inactive status ... *to cases in which in the judgment of the commanding officer* of the hospital will be benefited by hospitalization for a reasonable time. Those requiring merely domiciliary care by reason of age

or chronic invalidism will not be admitted...." AR 40–590 ¶ 6(b)(1) (emphasis added).

Plaintiffs have directed us to no regulation that describes an entitlement to free lifetime medical care. In fact, the regulations the retirees point to are inconsistent with such an entitlement. As a result, even assuming that the health care statutes granted the agency discretion, the recruiters' promises still cannot bind the government. *See Columbia Broadcasting Sys., Inc. v. United States,* 316 U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (explaining that an agency's regulations are binding on it).

Despite the momentary setting aside of 5 U.S.C. § 301 for purposes of this discussion, done solely for the purpose of responding to plaintiffs' brief, it is important to remember that regulations cannot be promulgated in a vacuum. The regulations "must be consistent with the statute under which they are promulgated." *See Larionoff,* 431 U.S. at 873, 97 S.Ct. 2150. The statutes applicable do not authorize entitlement to medical care.[17]

**C Neither the Commander–In–Chief's Inherent Authority Nor Any Statute Directed Towards the Functions of the Service Secretaries Is Sufficient to Authorize Promises of Free Lifetime Medical Care for Retirees**

██ The plaintiffs also assert that the Commander–in–Chief's inherent power in

---

**16.** The 1945 and 1947 editions of the MEDMAN contain broader language, including that a naval retiree "may be admitted to any naval hospital upon application," 1945 MEDMAN § 4132, and that naval retirees "shall, if in need of hospital care, be admitted," 1947 MEDMAN § 4132. In this case, however, neither of the plaintiffs-appellants joined the Navy on active duty during this time frame. But even if they had, the conclusion that 5 U.S.C. § 301 does not authorize the promise of free lifetime medical care would still control.

**17.** Our court has previously examined the relevant regulations to see if they authorized recruiters to promise free lifetime medical care, and concluded they did not:

> Nothing in these regulations [including AR 40–590, ¶ 6(b)1, AFR 160–73 ¶ 14, and MEDMAN § 3168] provided for unconditional lifetime free medical care or authorized recruiters to promise such care as an inducement to joining or continuing in the armed forces.... In any event, in view of the general pattern of the military regula-

combination with 10 U.S.C. §§ 3013, 5013, and 8013—which authorize the positions and enumerate the duties of the Secretaries of the Army, Navy, and Air Force respectively—authorized the recruiters' promises. The government counters that the plaintiffs had not raised this argument before appeal, implying that they had therefore waived the argument. We need not address waiver, however, because on the merits we find that neither the Commander–in–Chief's inherent authority nor the statutes directed toward the functions of the service secretaries is sufficient to authorize the promises of free lifetime medical care for retirees.

As Commander–in–Chief, the President does not have the constitutional authority to make promises about entitlements for life to military personnel that bind the government because such powers would encroach on Congress' constitutional prerogative to appropriate funding. Under Article I, § 8, only Congress has the power of the purse. To say that the Executive Branch could promise future funds for activities that Congress itself had not authorized would also violate both the Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1)(B) (stating that a federal employee "may not ... involve [the government] in a contract or obligation for the payment of money before an appropriation is made unless authorized by law"), and the Separation of Powers doctrine, for it would allow the Executive Branch to commandeer the power of the Legislative Branch. Again, under the Anti–Deficiency Act, no government official, including the Commander–in–Chief, can expend or obligate funds in a fiscal year that Congress has not appropriated: "the Act prohibits government officials and employees from making expenditures or incurring obligations in excess of available appropriations or in advance of appropriations." *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1449 (Fed.Cir.1997). Nor may he obligate funds for future years for an activity unless it has been authorized by law. Thus, to the extent that military recruiters, in the absence of statutory authority, make promises that impose an obligation on the federal Treasury, they exceed their constitutional authority and abrogate Congress' authority under the Appropriations Clause, U.S. Const., art. I, § 9, cl. 7. *See Cessna*, 126 F.3d at 1449 ("As far as government contracts are concerned, the Act 'bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, existing appropriation.... By its terms, the Anti–Deficiency Act restricts the ability of the government to enter into multi-year contracts [such as the life-long contracts in the present case] because funds generally cannot be obligated beyond the current fiscal year.'") (internal citations omitted).

The plaintiffs' argument that 10 U.S.C. § 8013 (the only statute relevant to the retirees) provides the requisite statutory authority for the recruiters' promises of full free lifetime health care fails. This statute and its predecessors simply list functions that the Secretary of the Air Force is authorized to perform. True, today 10 U.S.C. § 8013 authorizes the Secretary of the Air Force to conduct "recruiting." 10 U.S.C. § 8013(b)(1) (Supp. IV 1994). However, the statutes relevant to

---

tions that provides medical care to retirees only when facilities and personnel were available, we decline to read into the [Navy] Manual the creation of such an enduring and broad right to unconditional free lifetime medical care.
*Sebastian*, 185 F.3d at 1372.

the retirees here are those in effect in 1951 for Schism and 1953 for Reinlie: 10 U.S.C. § 8012(b)(1) (1942 Supp. IV) and 5 U.S.C. § 626–2(a) (1952 Supp. I), respectively. Neither statute included "recruiting" in the enumerated powers. In any event, the Secretary's authority to conduct recruiting does not carry with it the broad authority to make promises that bind future Congresses to appropriate funding for free lifetime care.

**D Congress Did Not Subsequently Ratify Full Free Lifetime Medical Care for Retirees By Enacting Annual Appropriations for the Armed Services**

■ Because we hold neither 5 U.S.C. § 301, nor any other asserted authority, authorizes the recruiters' promises of free lifetime medical care, the retirees can prevail only if the promises were later ratified by Congress. We hold that Congress did not ratify them.

■ Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958). The parties do not dispute that Congress may ratify agency conduct "giv[ing] the force of law to official action unauthorized when taken." *Swayne & Hoyt v. U.S.*, 300 U.S. 297, 302, 57 S.Ct. 478, 81 L.Ed. 659 (1937). Nor do they dispute the well-settled proposition that Congress will have ratified an agency action only if it had knowledge of that otherwise unauthorized activity in the first place. *See United States v. Beebe*, 180 U.S. 343, 345, 21 S.Ct. 371, 45 L.Ed. 563 (1901) (holding that "without that knowledge [of the act] there can be no ratifica-

tion"); *Brooks v. Dewar*, 313 U.S. 354, 360–61, 61 S.Ct. 979, 85 L.Ed. 1399 (1941) (ratification deemed to have occurred when, among other things, "[t]he information in the possession of Congress [about agency action] was plentiful and from various sources," including agency annual reports). And, in addressing Congress' knowledge of the agency activity at issue, e.g., an agency's construction of a statute or regulation, the Supreme Court has cautioned "a contemporaneous administrative construction of an agency's own enabling legislation 'is only one input in the interpretational equation. Its impact carries most weight when the administrators participated in drafting and directly made known their views to Congress in Committee hearings.'" *SEC v. Sloan*, 436 U.S. 103, 120, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978) (quoting *Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)).

■ Broadly stated, Congress may ratify an agency action through appropriation acts. *See Ex parte Endo*, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 89 L.Ed. 243 (1944); *Isbrandtsen–Moller Co. v. United States*, 300 U.S. 139, 147–48, 57 S.Ct. 407, 81 L.Ed. 562 (1937). But simply appropriating funds for some general purpose is insufficient: "[T]he appropriation must plainly show a purpose to bestow the *precise* authority which is claimed." *Endo*, 323 U.S. at 303 n. 24, 65 S.Ct. 208 (concluding that no purpose to bestow the precise authority existed when "a lump appropriation was made for the overall program of the [War Relocation] Authority and no sums were earmarked for the single phase of the total program which is here involved. Congress may support the effort to take care of these evacuees without ratifying every phase of the program."). (emphasis added). In other words, ratifi-

cation ordinarily cannot occur in the appropriations context unless the appropriations bill itself expressly allocates funds for a specific agency or activity. *See id.; see also Greene v. McElroy,* 360 U.S. 474, 505 n. 30, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ("[A]ppropriations of specific amounts for the Munitions Board or its successors, agencies with multifold objectives, without any mention of the uses to which the funds could be put, cannot be considered as a ratification of the use of the specified hearing procedures."); *cf. Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947) (concluding that when Section 1 of the First War Powers Act did not provide for the creation of a new agency that consolidates the functions previously exercised by one or more other agencies, "the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification of the action of the Chief Executive"); *Holden v. Joy,* 17 Wall. 211, 84 U.S. 211, 247–48, 21 L.Ed. 523 (1872) (holding that a treaty had been ratified through Congress' appropriation of funds "for the amount stipulated to be paid for the lands ceded by the Cherokees in the first article of the treaty ... and [funds] to fulfil [sic] and execute the stipulations, covenants, and agreements contained in the fourth, eleventh, seventeenth, and eighteenth articles of the treaty"); *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 293–94, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) (deciding that ratification of an administrative interpretation of a statute took place when Congress was explicitly and repeatedly informed that the contracts at issue adopted the administrative interpretation and still appropriated funds expressly for the projects), *overruled in part on other grounds, California v. United States,* 438 U.S. 645, 98 S.Ct.

2985, 57 L.Ed.2d 1018 (1978). In this case, then, the plaintiffs must show that Congress' military appropriations bills following their recruitment expressed a purpose to bestow authority on the military to make binding promises of free lifetime medical care to retirees.

The retirees argue that because Congress appropriated funds each year that were expended by the armed services for not only care for active duty personnel but also free medical care for retirees, it thereby ratified the recruiters' promises. This position, however, is at odds with the plaintiffs' acceptance of *Endo's* requirement that in order for ratification to occur the appropriation act itself must show a purpose to bestow the precise authority claimed and previously lacking. *See* Appellants' Br. at 45 (stating that "[s]imply appropriating funds that are used for some general purpose is likely insufficient. '[T]he appropriation must plainly show a purpose to bestow the precise authority which is claimed.' ") (citation omitted).

*Endo* is particularly instructive in that it squarely addresses the situation involving (as here) the alleged congressional ratification of an agency action through a general lump sum appropriation. In *Endo,* a case arising out of the World War II internment of Japanese–Americans, a detained citizen sought a writ of habeas corpus from a "relocation center" following her removal from her home in Sacramento, California. The government "evacuated" Endo under the authority of two executive orders: the first order authorized military commanders to exclude certain persons from certain geographical areas in the interest of national defense; the second order established the War Relocation Authority ("Authority"), an agency with the power to develop and implement a program to re-

move designated persons. The second order also charged the Authority with a duty to ensure "relocation, maintenance, and supervision" of "evacuees." 323 U.S. at 285–87, 65 S.Ct. 208.

Congress enacted legislation confirming the first executive order restricting Japanese–Americans' access to certain locales in the interest of national security. A military commander subsequently issued a proclamation that not only excluded Japanese–Americans from certain geographic areas, but also prohibited evacuees from leaving relocation centers without express permission from the commander. *Id.* at 289, 65 S.Ct. 208. The commander then gave control to the Authority over "ingress and egress of evacuees," including Endo, from the relocation centers. The Authority refused to release Endo, notwithstanding the fact that she had been given leave clearance, and the Authority conceded that she was not a suspected spy or saboteur. *Id.* at 294–95, 65 S.Ct. 208. Nonetheless, the Authority alleged "that detention for an additional period after leave clearance has been granted is an essential step in the evacuation program" and that these leave regulations were encompassed in general grants of power through executive order conferring the power to regulate as necessary to prevent espionage and sabotage. *Id.* at 294, 297, 65 S.Ct. 208. In considering this alleged power to detain a loyal citizen under the leave regulations, the Court cautioned against inferring broad congressional acquiescence from a general appropriation:

> It is argued, to be sure, that there has been Congressional ratification of the detention of loyal evacuees under the leave regulations of the Authority through the appropriation of sums for the expenses of the Authority. It is

pointed out that the regulations and procedures of the Authority were disclosed in reports to the Congress and in Congressional hearings. And it is shown that the leave program of the Authority was mentioned both in the House and Senate committee hearing on the 1944 Appropriation Act and on the floor of the House prior to passage of the 1944 Act. Congress may of course do by ratification what it might have authorized.... But the appropriation must plainly show a purpose to bestow the precise authority which is claimed. We can hardly deduce such a purpose here where a lump appropriation was made for the overall program of the Authority *and no sums were earmarked for the single phase of the total program which is here involved* [i.e., leave restrictions on detainees deemed loyal citizens]. Congress may support the effort to take care of these evacuees without ratifying every phase of the program.

*Id.* at 304 n. 24, 65 S.Ct. 208 (citations omitted) (emphasis added). Thus, in *Endo* an appropriations act that did not contain specific provisions for the action allegedly ratified by that act did not support congressional ratification. In fact, the Court indicated that even though the regulations and procedures were mentioned in committee hearings and reports, this alone was not sufficient to demonstrate ratification; rather the appropriation itself had to "plainly show a purpose to bestow the precise authority which is claimed." *Id.*

The remaining ratification precedents cited by the plaintiffs only support our analysis, as those cases each involved situations in which Congress had specifically mentioned and appropriated funds for the conduct in question. In *Ivanhoe Irrigation District,* for example, the Court con-

cluded that Congress had ratified agency construction of an authorizing statute as applied to various water projects, as shown by, among other things, (1) a record of the agency's construction in the annual report that the agency submitted to Congress; (2) "vigorous debate" in Congress about whether it should change this agency construction; (3) Congress' rejection of such a change in proposed legislation; and (4) *congressional appropriations for projects employing the agency's statutory construction.* 357 U.S. at 292–93, 78 S.Ct. 1174; *see also Brooks v. Dewar,* 313 U.S. at 360–61, 61 S.Ct. 979. In fact, the appropriations acts that Congress had passed specifically referenced the projects at issue and specifically permitted their renewal. *See Ivanhoe,* 357 U.S. at 286–87, 78 S.Ct. 1174.

Plaintiffs cannot reasonably rely on *Ivanhoe Irrigation District* for support because, unlike the circumstances in that case, nothing in the military appropriations acts plainly showed a "purpose to bestow the precise authority," *Endo,* 323 U.S. at 304 n. 24, 65 S.Ct. 208, to make binding promises for free lifetime medical care for retirees. In fact, the relevant appropriations statutes here are very broad and make *no mention of* health care for retirees at all, much less that such care be, free and provided for life.

Nor does *Fleming* compel a different result. *Fleming* involved the authority derived from the First War Powers Act. *See* 331 U.S. at 116, 67 S.Ct. 1129. In 1946, the President issued an executive order that effectively consolidated the Office of Price Administration and three other agencies into a new agency, the Office of Temporary Controls. *See id.* at 114, 67 S.Ct. 1129. Section 1 of the First War Powers Act, however, did not explicitly

authorize the creation of this new agency. Nevertheless, in reviewing whether Congress had ratified the creation of this agency, the Supreme Court determined that "[a]ny doubts on this score would ... be removed by the recognition by Congress in a recent appropriation of the status of the Temporary Controls Administrator. That recognition was an acceptance or ratification by Congress of the President's action in [the] Executive Order...." *Id.* at 116, 67 S.Ct. 1129. The appropriations bill there had expressly earmarked funds for "Office of Temporary Controls. Salaries and expenses: For an additional amount, fiscal year 1947, for the Office of Price Administration transferred by Executive Order 9809 of December 12, 1946 to the Office of Temporary Controls: $7,051,752." *Id.* at 119 n. 10, 67 S.Ct. 1129. Accordingly, as the language in the appropriations statute at issue in *Fleming* specified that funds were to go to the very agency created by the executive order, the Court concluded that Congress had ratified that agency's creation. *Id.* at 116, 67 S.Ct. 1129.

In this case, by contrast, the plaintiffs have not pointed to any statements in any military appropriations act that specifically authorized payment for military retirees' non-contingent free lifetime care. Accordingly, they cannot compare their situation to *Fleming.* Indeed, the appropriations and authorization acts that the plaintiffs draw to our attention are noteworthy only for their generality and complete silence about health care for retirees. For example, the Navy authorization and appropriations acts cited by the plaintiffs refer only to funds to operate and maintain naval hospitals and to treat "patients": "Commencing with the fiscal year 1944, annual appropriations in such amounts as may be necessary are authorized from the general

fund of the Treasury for the maintenance, operation, and improvement of naval hospitals," 24 U.S.C. § 14a (1940, Supp.3, 1943); "care, maintenance, and treatment of patients in naval hospitals as provided by regulation," 60 Stat. 489 (1946); "and other necessary expenses, including care, maintenance, and treatment of patients in naval and other hospitals; $137,000,000," 58 Stat. 310 (1944). The word "retired" appears nowhere. So too with the Army authorization bills offered for our review: "for medical care and treatment of patients when entitled thereto by law, regulation, or contract ... except when elective treatment has been obtained in civilian hospitals," 58 Stat. 583 (1944), and "medical and dental care of personnel entitled thereto by law or regulation, and other measures necessary to protect the health of the Army," 83 Stat. 472 (1969). In fact, only one of the statutes cited to us is actually an *appropriations* act—setting out a specific amount allocated—as opposed to an *authorization* act. As shown above, the language in that appropriation is very broad; indeed it is antithetical to the requirement of *Endo* for ratification to have taken place here.

Neither are we dissuaded from our conclusion by *Isbrandtsen–Moller Co., Inc. v. United States*, 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1937), also cited by the plaintiffs. The relevant issue there was whether an appropriations act authorized (or ratified) the abolition of the Shipping Board and the transfer of its functions to the Department of Commerce by Executive Order. To the extent *Isbrandtsen–Moller* is relevant at all, it undercuts rather than supports the plaintiffs' argument. Importantly, the appropriations in *Isbrandtsen–Moller* were especially "earmarked" for the Department of Commerce to carry out the Executive Order. Al-

though the Supreme Court found it unnecessary to reach the ratification issue (since the 1936 Merchant Marine Act vested the functions of the former Shipping Board in the Department of Commerce under the same Executive Order, *see id.* at 147–48, 57 S.Ct. 407), its view on the matter was clear:

> Whatever doubt may be entertained as to the intent of Congress that the Shipping Board should be subject to transfer by the President ... Congress appears to have recognized the validity of the transfer and ratified the President's action by the appropriation Acts of April 7, 1934, March 22, 1935, and May 15, 1936, all of which make *appropriations to the Department of Commerce for salaries and expenses to carry out the provisions of the Shipping Act* as amended *and refer to the executive order.*

*Id.* at 147, 57 S.Ct. 407 (emphasis added) (footnotes omitted).

Although *Isbrandtsen–Moller* pre-dated *Endo*, this statement comports with the Supreme Court's later pronouncement that to demonstrate congressional ratification though appropriation statutes, the statute "must plainly show a purpose to bestow the precise authority which is claimed." *Endo*, 323 U.S. at 304 n. 24, 65 S.Ct. 208. As the text of the specific appropriations statutes illustrates, this did not happen here. We must conclude, therefore, that in enacting military appropriations. Congress did not ratify the promises of free lifetime health care.

The plaintiffs also argue that individual congressmen were aware of the promises made by the recruiters and that the military had kept the promises for many years. The logical conclusion from this statement is that because congressmen

knew that free healthcare was still being provided, the fact that they did not intervene amounts to an implied ratification of the practice of providing free health care. While this argument appears to be one for congressional acquiescence (which we discuss below), full congressional knowledge or awareness of the conduct being ratified is necessary for ratification. *See United States v. Beebe*, 180 U.S. at 345, 21 S.Ct. 371; *Brooks v. Dewar*, 313 U.S. at 360–61, 61 S.Ct. 979; Harold G. Reuschlein & William A. Gregory, *The Law of Agency and Partnership*, § 30, at 74 (West 2d ed.1990) (stating "At the time of ratification, the purported principal must have knowledge of all material facts concerning the transaction."). Simply offering the statements of several congressmen is insufficient to demonstrate Congress' knowledge. Indeed, as the Supreme Court has explained, "[f]loor debates reflect at best the understanding of individual Congressmen." *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). And even "language in a Committee Report without additional indication of more widespread congressional awareness" cannot invoke a presumption of general congressional awareness. *SEC v. Sloan*, 436 U.S. 103, 121, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). Rather, this knowledge requirement is demonstrated when Congress appropriates funds specifically addressing and enabling the conduct in question. This is so because, by definition, Congress as a whole has knowledge of an activity when it specifically approves the appropriation of funds for that activity.

Because the plaintiffs cannot show that Congress knowingly ratified the promises of free lifetime medical care, or that there was actual authority for such care, Schism's breach-of-contract claim is not saved.

### E Congress Did Not Subsequently Provide Authority for an Entitlement to Lifetime Free Medical Care for Retirees Through Acquiescence

■■■ While not briefed by the parties, acquiescence was raised by the court during oral argument. The relevant question is whether Congress acquiesced in the military departments' interpretation of the statutes and regulations so as to provide the requisite "actual authority" to contract for an entitlement to free lifetime medical care for retired personnel. The query arises because the government indisputably provided conditional free medical care for many retirees until TRICARE's introduction. Thus, the argument is that Congress tacitly approved of and thereby acquiesced in an interpretation of the statutes and regulations that they implicitly authorized free lifetime medical care for military retirees. As we explain below, Congress did not acquiesce; and, in fact, Congress' enactment of CHAMPUS and other legislation, such as TRICARE, unequivocally illustrates the contrary.

The doctrine of acquiescence is premised upon Congress' failure to act in response to an action it might view as previously unauthorized, unlike the ratification context where Congress affirmatively acted to demonstrate its approval of an agency action. *See, e.g.,* Reuschlein & Gregory, § 33 at 76–77 (describing acquiescence as "implied ratification"); *United States v. Midwest Oil Co.*, 236 U.S. 459, 470–73, 35 S.Ct. 309, 59 L.Ed. 673 (1915) (discussing that although no explicit authority existed for the President to withdraw any land from the public interest, the long-continued practice of withdrawing public lands from private acquisition, done with the knowledge and acquiescence of Congress, would raise a presumption that the with-

drawals had been made with its consent or in recognition of an administrative power of the Executive in the management of the public lands); *United States v. Rutherford*, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (explaining that deference to an agency's interpretation of a statute is particularly appropriate when "an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (holding Congress acquiesced to the IRS's interpretation of § 503(c)(3) through its repeated failure to act on bills to overturn the agency's rulings); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) ("[A] refusal by congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it."); *see also* Restatement (Second) of Agency § 43(1) ("Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance."); 3 Am.Jur.2d Agency § 197 (1986) (explaining that, as with ratification, no acquiescence takes place "unless the principal has full and complete knowledge of all the material facts attending the unauthorized transaction") (footnote omitted).

Nevertheless, the Supreme Court has repeatedly cautioned against using congressional silence alone to infer approval of an administrative interpretation. *See Rutherford*, 442 U.S. at 554 n. 10, 99 S.Ct. 2470 ("To be sure, it may not always be realistic to infer approval of a judicial or administrative interpretation from congressional silence alone."); *Riverside Bayview Homes*, 474 U.S. at 137, 106 S.Ct. 455 ("[W]e are chary to attributing significance to Congress' failure to act...."); *Bob Jones Univ.*, 461 U.S. at 600, 103 S.Ct. 2017 ("Non-action by Congress is not often a useful guide...."); *Solid Waste Agency of Northern Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 169, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care."); *see also First Nat'l City Bank v. United States*, 214 Ct.Cl. 585, 557 F.2d 1379, 1384 (1977) (recognizing "that the doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting ambiguous statutory provisions" but concluding that "Congress, if it had considered the [IRS's] interpretation erroneous, would have amended the section when it reenacted the statute; its failure to do so implies that the administrative pronouncement was not inconsistent with the intent of the statute" and, therefore, Congress "legislatively concur[red]" in the agency's interpretation). Indeed, two recent Supreme Court cases that find congressional acquiescence, *Bob Jones University* and *Riverside Bayview Homes*, are careful to explain the importance of Congress' extensive awareness of the interpretation to which it had allegedly acquiesced. *See also Dames & Moore v. Regan*, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) ("Past practice does not, by itself, create power, but 'long-continued practice,

*known* to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent ....'") (quoting *Midwest Oil,* 236 U.S. at 474, 35 S.Ct. 309) (emphasis added).

In *Bob Jones University,* parochial colleges challenged denial of tax-exempt status based on the Internal Revenue Service's determination that these schools operated under racially discriminatory policies. The IRS had issued rulings in 1970 and 1971 deeming schools with such policies not "charitable" as contemplated by the Internal Revenue Code. *See Bob Jones Univ.,* 461 U.S. at 598, 103 S.Ct. 2017. The Court concluded that:

> Failure of Congress to modify the IRS rulings of 1970 and 1971, of which Congress was, by its own studies and by public discourse, constantly reminded; and Congress' awareness of the denial of tax-exempt status for racially discriminatory schools when enacting other and related legislation make out an unusually strong case of legislative acquiescence in and ratification by implication of the 1970 and 1971 rulings.

*Id.* at 599, 103 S.Ct. 2017. The *Bob Jones University* Court determined that there was clear congressional acquiescence in the IRS's action based on the abundance of knowledge that Congress had on the issue of tax-exemption and discriminatory practices. This was no "ordinary claim of legislative acquiescence" in that shortly after the IRS issued its ruling Congress held "[e]xhaustive hearings" on the issue of discrimination and tax-exemption:

> Non-action by Congress is not often a useful guide, but the non-action here is significant. During the past 12 years there have been no fewer than 13 bills introduced to overturn the IRS interpre-

tation of § 501(c)(3) [the tax-exempt provision for charitable organizations]. Not one of these bills has emerged from any committee, although Congress has enacted numerous other amendments to § 501 during this same period, including an amendment to § 501(c)(3) itself. It is hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly aware of what was going on. In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced in the IRS rulings of 1970 and 1971.

*Id.* at 600–01, 103 S.Ct. 2017 (citations omitted). Thus, Congress' knowledge of the interpretation allegedly acquiesced to was crucial to the Court's finding.

A similar situation occurred in *Riverside Bayview Homes.* That case involved the Army Corps of Engineers' interpretation of the Corps' regulation defining the "waters of the United States." 474 U.S. at 126, 106 S.Ct. 455. In 1975, the Corps issued interim final regulations that construed "waters of the United States" to include all "freshwater wetlands" that were adjacent to other covered waters. *Id.* at 123–24, 106 S.Ct. 455. In 1977, this construction was met with congressional opposition: a bill from the House of Representatives reported out of committee proposed a redefinition which limited the Corps' authority, and a bill reported by the Senate did not include a redefinition, but did focus on the potential problem of over-regulation by the Corps. *Id.* at 136, 106 S.Ct. 455. The debate in both chambers of Congress was lengthy, culminating in legislation that "retain[ed] [the Corps'] comprehensive jurisdiction over the Nation's

waters." *Id.* at 137, 106 S.Ct. 455. The Court found Congress' treatment of the Corps' jurisdiction significant in that the Corps' construction of its own jurisdiction was specifically brought to Congress' attention, and Congress rejected attempts to alter it. *Id.* In determining that Congress had acquiesced to the Corps' interpretation, the Court stated

> Although we are chary of attributing significance to Congress' failure to act, a refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the *administrative construction has been brought to Congress' attention* through legislation specifically designed to supplant it.

*Id.* (emphasis added). Thus, the Supreme Court has repeatedly made clear that an important foundation of acquiescence is that Congress as a whole was made aware of the administrative construction or interpretation and did not act on contrary legislation despite having this knowledge.

Turning to the facts of our case, the plaintiffs have offered virtually no legislative evidence that Congress as a whole was aware of the fact that the recruiters had promised, and the military branches had to an extent provided, free lifetime medical care for military retirees.[18] In fact, a statement made by Representative Kilday refers to a right of the retirees "which has existed on a space-and-facilities-available basis over a long time." 84 Cong. Rec.

3849 (1956); *see* 146 Cong. Rec. S1806 (Mar. 28, 2000) (statement from Senator Leahy explaining that military retirees relied on base hospitals for space-available free medical care). In addition, plaintiffs offered the statement of Representative Boyd that "although used by the services for decades as an effective recruitment and retention tool, this promise [of lifetime free medical care] has no basis in law." 146 Cong. Rec. E792. Thus, it seems clear that from the beginning Members of Congress understood that the retirees in fact were entitled to only conditional health care and that the recruiters' broader promises were unenforceable.

Further, and perhaps most damaging to any argument for acquiescence, when the issue of medical care for retirees was clearly before Congress, the result was the Dependents Medical Care Act of 1956, CHAMPUS, and in 1986, TRICARE—programs which did not provide for unconditional free lifetime medical care for veterans. *See, e.g.,* H.R.Rep. No. 84–1805, at 4 (explaining that Title 1 of the proposed legislation, which became the 1956 Act, would authorize entitlement to medical care on a space available basis in facilities under the jurisdiction of the uniformed services for wives and children, dependent parents and parents-in-law, retired personnel and their dependents and wives and children of deceased personnel who died while in active duty).

The 1956 Act provided for conditional health care for retirees: "a member or

---

18. The plaintiffs point to only four references where congressmen spoke on the House or Senate floor regarding free lifetime medical care. Of these offered statements, only one, that of Senator Johnson, 146 Cong. Rec. S10383 (Oct. 12, 2000), states that military retirees had been promised lifetime health care for themselves and their dependents.

And the statements of several congressmen on the floor cannot sufficiently put all of Congress on notice of a specific agency interpretation. *See Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) ("Floor debates reflect at best the understanding of individual Congressmen.").

former member of a uniformed service who is entitled to retired ... pay *may*, upon request, be given medical and dental care in any facility of any uniformed service, *subject to the availability* of space and facilities and the capabilities of the medical and dental staff." 10 U.S.C. § 1074(b) (emphases added). The conditionality of this provision was clarified further during the debates regarding the proposed act. For example, a Member of Congress asked the following: "Would it be possible, under this legislation, for a young man to enlist in one of the armed services at the age of 17, retire at the age of 37, and obtain, not only during his 20 years of service, but the remainder of his life, full medical care for his wife, children, adopted children, stepchildren, and his father and mother, and mother-in-law and father-in-law as well?" 102 Cong. Rec. 3849 (1956). In response, Congressman Kilday, the floor manager of the bill stated "The gentleman's question is all inclusive. This bill would not create any right to any portion of any of the things the gentleman has mentioned. *It would continue a right which has existed on a space-and-facilities-available basis over a long period of time,* under which one retired for length of service or disability would be entitled to hospitalization for himself and for his dependents." *Id.* (emphasis added). Thus, it is evident that from the beginning, Congress intended health care for retirees to be conditional.[19]

As detailed above, in 1966, Congress again visited the issue of health care for retired service members and their dependents. The 1966 Act permitted the Department of Defense to contract for health insurance for retirees under the same provisions established for active duty dependents in the 1956 Act. More relevant to this case, § 1074 was amended but still contained the language that provided for medical care in military hospitals for retirees only on a space-available basis. Thus, despite modifying the precise section that included limiting health care for retirees to space availability, Congress retained this condition. Accordingly, the 1966 Act further reflected Congress' intention that retirees receive free health care only on a conditional (*i.e.,* a space-available) basis.

Similarly, full free lifetime health care did not stem from TRICARE; otherwise the veterans would not have brought this suit. In fact, under TRICARE, health care was provided to younger retired veterans upon payment of a monthly premium, coupled with deductibles and other associated fees.

Indeed, following over 100 years of legislation, the status of medical care for retired members and their dependents was as follows in 1996:

The primary form of health care authorized for military retirees and their dependents and survivors *before they become eligible for hospital insurance benefits under the Social Security Act,* as amended, is TRICARE, which integrates the entitlement to CHAMPUS with the services available to retirees, their dependents, and survivors in military medical facilities depending on "availability of space and facilities and the capabilities of the medical and dental staff." 10 U.S.C. § 1074(b) (retirees) and § 1076(b) (dependents or survivors

---

**19.** The 1956 Act is recognized largely for its procurement of insurance to pay for civilian medical care for dependents of members on active duty. However, for reasons largely involving the cost of such a program, retirees and their dependents were not included as groups who could receive civilian care at the government's expense.

of retired members). Even after they become eligible for Social Security hospital insurance benefits, retirees, their dependents, and survivors may receive treatment at military medical facilities on a space-available basis.

*Military Compensation Background Papers* at 613 (emphasis added).

Thus, whenever Congress as a whole dealt with the issue of health care for retirees, it made clear that the retirees were not entitled to unconditional free lifetime medical care; rather they could receive health care on a space-available basis or for a fee (either in the form of a premium or a deductible). *See Military Compensation Background Papers* at 609 ("As [formulated by Congress], *medical care for retirees* in military medical facilities *has always been,* and to this day remains, a privilege, *not an absolute right,* as has been assumed by many.") (emphases added). Such a scenario is the opposite to that of *Bob Jones University* and *Riverside Bayview Homes:* in those cases when Congress as a whole was presented with an agency's interpretation, the Supreme Court found that Congress had adopted the agency's interpretation through acquiescence (or inaction). Here, on the other hand, when Congress considered healthcare for retirees it acted decisively by denying entitlement to free lifetime medical care. Thus, Congress' action itself vitiates any argument of acquiescence.

Also pertinent to the present case is the fact that the acquiescence cases involve an agency's interpretation of a statute. Here no interpretation was done. The regulations already were unambiguous: free health care was provided to military retirees on a conditional basis. The language of the relevant regulations was always sufficiently clear and the regulations were

carried out in accordance with their plain meanings.

In the end, because no actual authority existed for the recruiters' promises of full free lifetime medical care, the plaintiffs cannot show a valid implied-in-fact-contract. Thus, plaintiffs' claim must fail as a matter of law.

## F Congress's 2000 Enactment of TRICARE for Life Supports our Analysis

Congress' approval of the Defense Authorization Act for Fiscal Year 2001 does not change our analysis. *See* Floyd D. Spence National Defense Authorization Act for FY 2001, Pub.L. No. 106–398, § 712 (2000). In 2000, Congress established "TRICARE For Life," which (1) provides a pharmacy services program for Medicare-eligible beneficiaries; and (2) authorizes Medicare-eligible beneficiaries who enroll in Medicare Part B to participate in CHAMPUS.

The plaintiffs correctly argue this legislation does not alter their breach of contract claim against the government. But while it does not alter their claim, the TRICARE For Life provision does further demonstrate that Congress did not believe retirees had an unqualified right to free lifetime medical care. TRICARE For Life was heralded as a breakthrough for retirees over the age of 65 and their dependents. *See, e.g.,* TRICARE; Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); Eligibility and Payment Procedures for CHAMPUS Beneficiaries Age 65 and Over, 66 Fed. Reg. 40,601, 40,602 (Aug. 3, 2001) (Preamble of the implementing regulation stating "[t]hese new benefits for retirees and their eligible family members over age 65 result

in a remarkably comprehensive health care benefit with minimal beneficiary out-of-pocket cost."). If Congress believed that the veterans already had free lifetime healthcare, why would such a program be needed? And why would Congress refer to "out of pocket cost?" The question answers itself: Congress never thought that it had given military retirees the right to free lifetime medical care, and nor did it believe that it had vested the various military branches with the power to make binding promises to that effect.

## III. Discovery

 The government had moved the district court to stay further discovery pending resolution of its motion for summary judgment. The court granted the motion, subject to revisiting the issue had the government's summary judgment motion been nondispositive. The district court opined that it "careful[ly] review[ed]" the requested discovery and "conclud[ed] that the burden and expense of the subject discovery outweighed its likely benefit at this stage of the proceedings." *Schism*, No. 3:96cv349/RV, Order at 1 (Sept. 19, 1997). The trial judge, however, did require the government to respond to the plaintiffs' first four discovery requests. *See id.* We find unavailing plaintiffs' arguments that more discovery was necessary. A trial court "has wide discretion in setting the limits of discovery." *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir.1991). And on the record before us, we cannot say that the trial court abused its discretion. *Schism*, No. 3:96cv349/RV, Order at 1.

## IV. Conclusion

We cannot readily imagine more sympathetic plaintiffs than the retired officers of the World War II and Korean War era involved in this case. They served their country for at least 20 years with the understanding that when they retired they and their dependents would receive full free health care for life. The promise of such health care was made in good faith and relied upon. Again, however, because no authority existed to make such promises in the first place, and because Congress has never ratified or acquiesced to this promise, we have no alternative but to uphold the judgment against the retirees' breach-of-contract claim.

Federal judges have a duty to uphold the Constitution and the laws, even if that means making unpleasant or unpopular decisions. Congress, on the other hand, has the power to make law, not simply to interpret and apply it. As our predecessor court said:

> Congress has the power and authority under the Constitution to establish a system for the payment of retired pay [for military service members] and to change the system from time to time.... We understand and appreciate the dissatisfaction of the plaintiffs with the change in the retirement pay system, as they have rendered long and faithful service to our country in time of peace and war. However, if they are to get any relief, it must come from Congress, as this is not within [a court's] jurisdiction.

*Abbott v. United States*, 200 Ct.Cl. 384, 390 (1973). Perhaps Congress will consider using its legal power to address the moral claims raised by Schism and Reinlie on their own behalf, and indirectly for other affected retirees.

For the reasons stated above, the district court's grant of summary judgment for the government is

*AFFIRMED.*

MAYER, Chief Judge, with whom Circuit Judge NEWMAN, Senior Circuit Judge PLAGER, and Circuit Judge GAJARSA join, dissenting.

This case puts me in mind of Kipling's apparently timeless lament of the soldier once need for his service has passed:

> You talk o' better food for us, an' schools, an' fires, an' all:
>
> We'll wait for extry rations if you treat us rational.
>
> Don't mess about the cook-room slops, but prove it to our face
>
> The Widow's Uniform is not the soldier-man's disgrace.
>
>> For it's Tommy this, an' Tommy that, an' "Chuck him out, the brute!"
>>
>> But it's "Saviour of 'is country" when the guns begin to shoot;
>>
>> An' it's Tommy this, an' Tommy that, an' anything you please;
>>
>> An' Tommy ain't a bloomin' fool—you bet that Tommy sees! [1]

Promises of lifetime medical care were made to military officers by military officials for more than 50 years. Likewise Congress knew, or certainly should be charged with knowing, how the billions of dollars it appropriated for military medical care were allocated and that the amounts it appropriated for military pay were diminished by the imputed value of medical care on active duty and after retirement. Congress is presumed to know the terrain against which it legislates. To suggest it was oblivious, that it did not know military officials were promising medical care in accordance with its appropriations is pure

sophistry. If it were otherwise, if Congress can appropriate billions for this aspect of national defense and not know how it is accounted for, then God save the Republic.

Of course Congress knew; of course the service secretaries authorized promises in return for service; of course these military officers served until retirement in reliance; and of course there is a moral obligation to these men: it is called honoring the contract the United States·made with them and which they performed in full. Because the court countenances the government's breach of the implied contracts and its taking of the rights vested in these retired servicemen, I dissent.

## I.

More than a century ago, the Supreme Court held that the government cannot deprive a party with which it contracts "of the fruits actually reduced to possession of contracts lawfully made." *Sinking Fund Cases*, 99 U.S. 700, 720, 25 L.Ed. 496 (1878); *see also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In requiring military retirees, who were promised lifetime health care, to advert to Medicare and pay for the shortfall in coverage, the government wrongfully diminished the value of their contractual "fruits," it breached its implied-in-fact contract with them.

A contract implied-in-fact is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the

---

**1.** Rudyard Kipling, *Tommy*, (1890), *reprinted in* The Norton Anthology of Poetry 868 (3d ed.1983). (Tommy is a diminutive of "Thom- as Atkins," a nickname for British soldiers, akin to G.I. in this country.)

surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *see also Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). A binding implied-in-fact contract arises between a private party and the government upon proof by the person of: "(1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract." *See City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990). I address each of these requirements in turn.

## A. *Mutuality of Intent to Contract*

In order to recruit, train, and maintain a military force, the secretaries of the military departments are delegated authority to create compensation and benefits packages for servicemen. *See* 5 U.S.C. § 301.[2] The military has used promises of free lifetime health care to recruit and retain personnel to perform hazardous duties, often for less pay than they could have received in the civilian sector, and for less pay than it otherwise would have had to offer. The government concedes that recruiters made good faith representations to potential recruits that, upon retirement, they and their dependents would receive free lifetime health care. In fact, the rec-

ord shows that the Army made these promises in its recruiting brochures as recently as the 1990s. *See* "Army Benefits," Department of the Army, U.S.G.P.O.1992, 643–711 ("Health care is provided to you and your family members while you are in the Army, and for the rest of your life if you serve a minimum of 20 years of active Federal service to earn your retirement.").

Based on the Secretary of the Navy's letter in 1945, which said that retired officers are entitled to medical care and hospitalization by naval medical facilities, it is apparent that the recruiters made these promises at the direction of the service secretaries. In determining whether the government intended to contract, we presume that the secretaries carried out their duties in good faith and in accordance with law when making these promises. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) (Government officials are presumed to have "properly discharged their official duties."); *T & M Distrib. v. United States*, 185 F.3d 1279, 1285 (Fed.Cir.1999) ("[G]overnment officials are presumed to act in good faith...."). This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed.Cir.1993), and is valid and binding unless "well-nigh irrefragable proof rebuts or overcomes it". *Id.; LaChance v. White*, 174 F.3d 1378, 1381 (Fed.Cir.1999).

Because the secretaries made these offers in furtherance of their statutory duties to recruit and retain, they must

---

**2.** In relevant part, 5 U.S.C. § 301 says, "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of

its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."

have intended to be contractually bound because a contrary intent would degrade their long-term ability to recruit new servicemen. *See Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors."); 146 Cong. Rec. H7059 (daily ed. July 26, 2000) (statement of Rep. Bartlett) ("The recruitment brochures promised them and their family lifetime care in a military facility. We have broken that promise, and we are paying a heavy price for having broken that promise. Three of the services are now unable to meet their recruitment goals, and that is partly because when prospective enlistees confer with their father or their uncle or their grandfather, they frequently get the advice that 'I am not sure that you can believe what they are telling you, because they did not keep their promise to me.' We are having problems with retention for exactly the same reason, because our young men and women in the military are not sure that what we have now promised them is going to be there after they retire because we have broken our promise to their elders."). The retirees submitted affidavits stating that they served twenty or more years in military service with the expectation of lifetime health care and describing how the government provided these benefits until 1995. They intended their actions to be in performance of a binding contract between them and the government.

## B. *Consideration*

There was consideration in the mutuality of obligation: the retirees serve in the armed forces for at least twenty years; the government provides health care to them and their dependents for the remainder of their lives. In *Barker v. Kansas,* 503 U.S. 594, 604, 112 S.Ct. 1619, 118 L.Ed.2d 243 (1992), the Supreme Court held that for purposes of state taxation, military retirement benefits are considered deferred compensation for past services. Similarly, lifetime health care is a deferred component of the retirees' compensation in consideration of their continuance in military service for at least twenty years. "No one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had expected to be able to earn. *Cf. Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). It is quite a different matter, however, for Congress to deprive a service member of pay due for services already performed, but still owing. In that case, the congressional action would appear in a different constitutional light. *Cf. Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935)." *United States v. Larionoff,* 431 U.S. 864, 879, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977).

## C. *Lack of Ambiguity in Offer and Acceptance*

The retirees submitted affidavits from former recruiters describing specific offers made to prospective recruits and servicemen to persuade them to enlist, reenlist or continue their military careers until retirement, in some cases indicating that the benefits should be considered as part of their compensation. *See, e.g.,* Border Aff. ("I specifically remember one incident that has always stood out in my mind. On an [Inspector General] Inspection in January 1949, [several officers] gave the eight re-

cruiters in Denver a talk on the benefits of permanent health care and free medicine that we would be entitled to for the rest of our lives. We were told that we had to consider this as a *part of our pay.*"). According to the district court, "[i]t is obvious ... recruiters made promises to potential recruits that they could obtain lifetime medical care for themselves and their dependents by joining the armed forces and fulfilling certain service obligations." *Schism v. United States,* 19 F.Supp.2d 1287, 1294 (N.D.Fla.1998).

During the recent debates surrounding the 2001 Defense Authorization Act, the offers of lifetime health care made to retirees such as Schism and Reinlie were emphatically recognized. *See, e.g.,* 146 Cong. Rec. H3322 (daily ed. May 18, 2000) (statement of Rep. Frost) ("[Rep. Shows] has introduced legislation that would fulfill a promise that has been made to every member of the armed services: Stay in 20 years and they will receive healthcare for the rest of their life."); 146 Cong. Rec. S4621 (daily ed. June 7, 2000) (statement of Sen. Johnson) ("We all know the history: For decades, men and women who joined the military were promised lifetime health care coverage for themselves and their families. They were told, in effect, if you disrupt your family, if you work for low pay, if you endanger your life and limb, we will in turn guarantee lifetime health benefits. Testimony from military recruiters themselves, along with copies of recruitment literature dating back to World War II, show that health care was promised to active duty personnel and their families upon the personnel's retirement."); 146 Cong. Rec. S10336 (daily ed. Oct. 12, 2000) (statement of Sen. Warner) ("I am pleased to announce that the conference report to accompany the National Defense Authorization Act for Fiscal Year 2001 includes a permanent health care benefit for retirees-modeled on the Senate bill. I am delighted that we have honored the commitment of health care for life that was made to those who proudly served this nation. This is long overdue."). There is no doubt that the government made an unambiguous offer of free lifetime health care, and that the retirees accepted that offer by their performance of career military service. *See* Restatement (Second) of Contracts § 45(1) (1981). It is gratifying that at least Congress recognized the contractual obligation, and worked for five years to prospectively remedy the breach.

### D. *Authority to Bind the Government*

The court says that any promise of free lifetime health care is unenforceable for lack of express authority from Congress. It cites *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947), which stands for the proposition that one, who deals with a government agent bears the burden of determining that the agent is authorized to bind the government. But this principle does not inform my view, because there is nothing in the record suggesting that the recruiters who made these promises were not authorized to do so. There is nothing in the regulations or law prior to 1956 that would have prohibited recruiters from making these promises; indeed those regulations appear to authorize them. At the least, there is no inconsistency between them. The recruiting letter from the Secretary of the Navy is evidence that the leadership of the military departments authorized, endorsed and officially echoed those promises. The court views this as insufficient, but the government, which has all the needed evidence, resisted discovery and the district court prematurely ended it. Under these circumstances and view-

ing the available evidence in the light most favorable to the retirees, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), I am persuaded that it confirms the institutional practice.

*Merrill* recognizes that legal authority may be delegated to agencies. 332 U.S. at 384, 68 S.Ct. 1. The statute, 5 U.S.C. § 301, delegated broad authority to the secretaries to govern their respective military departments. Before 1956, promises of lifetime health care were well within the discretion and power of the secretaries. Funding by Congress of the military's health care system confirmed this broad delegation. Congressional delegation of authority along with the absence of any contrary statutes or regulations in force at the time the retirees entered military service, both in World War II and again in Korea, gives the promises of lifetime health care made by recruiters, under the authority of the secretaries, the force of law and creates a contract implied-in-fact binding upon the government.

In *Lynch*, the Supreme Court examined Congress' ability to avoid paying out benefits promised under a contract and contrasted it with congressional power over gratuities that can "be redistributed or withdrawn at any time in the discretion of Congress." 292 U.S. at 577, 54 S.Ct. 840. Gratuities "involve no agreement of parties; and the grant of them creates no vested right." *Id.* The plaintiffs in *Lynch* had entered into agreements with the United States for War Risk Insurance and had paid the prescribed monthly premiums. *Id.* Congress delegated power to the Veterans Administration to prescribe the form of policies, and the form provided that the policies were subject to amendment and regulations then in force and

thereafter adopted. Congress subsequently enacted the Economy Act which included a clause stating: "... all laws granting or pertaining to yearly renewable term insurance are hereby repealed...." *Id.* at 575, 54 S.Ct. 840. Nevertheless, the Supreme Court held that Congress could not curtail the benefits, which the government had contracted to pay, stating that "[n]o doubt there was in March, 1933, great need of economy.... But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States." *Id.* at 580, 54 S.Ct. 840.

5 U.S.C. § 301 and the military regulations are evidence of the broad authority the military secretaries had to manage their departments, including creating packages of incentives to recruit and retain personnel for hazardous military duties, and to bind the government to contracts in furtherance of their statutory function to recruit servicemen. *See, e.g.,* 10 U.S.C. §§ 3013, 5013, 8013 (1994) (The secretaries have "the authority necessary to conduct, all affairs of the Department[s] ..., including the following functions: (1) Recruiting....."). The government now disparages section 301 as a mere housekeeping rule, citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 310, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), which pertained to matters starkly different from ours, but before the panel in this case it said:

> In 1966, *pursuant to 5 U.S.C. § 301* and 10 U.S.C. § 1086, DoD created a program of health care for all service members, including retirees, known as CHAMPUS (32 CFR Part 199). CHAMPUS is "essentially a supplemental program to the Uniformed Services direct medical care system. The Basic Program is similar to private insurance programs, and is designed to provide

financial assistance to CHAMPUS beneficiaries for certain prescribed medical care obtained from civilian sources" (32 CFR § 199.4(a)).

Respondents' Brief at 11 (emphasis added). It strikes me as incongruous that section 301 could support creation of a comprehensive military health care program, but not support contracts for care. That is because it is not true. This shows that the secretaries interpreted the law over the years consistent with the retirees' understanding. As the Court said in *United States v. Alabama Great Southern R.R. Co.*, 142 U.S. 615, 621, 27 Ct.Cl. 561, 12 S.Ct. 306, 35 L.Ed. 1134 (1892):

> We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit. It is a settled doctrine of this court that in case of ambiguity the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced.

I see no meaningful difference between the situation in *Larionoff*, 431 U.S. 864, 97

S.Ct. 2150, 53 L.Ed.2d 48, where the statute explicitly authorized a reenlistment bonus, and the present situation, where 5 U.S.C. § 301 delegates broad authority to the secretaries to recruit servicemen. Prior to the enactment of 10 U.S.C. § 1074(b)[3] in 1956, the secretaries had such authority and nothing in law or regulations precluded them from contracting to provide these benefits in exchange for twenty years of service. Though the congressional authority was delegated rather than direct, the contract between the retirees and the government is no less binding than the promise to pay a reenlistment bonus whose amount was based on a formula set well before the time at which it was to be paid in *Larionoff*.

## II.

When the government forced the retirees to rely on insufficient Medicare, it breached the contract. *Winstar Corp. v. United States*, 64 F.3d 1531, 1546 (Fed.Cir. 1995), held that the terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation, absent a specific contractual provision providing for such a change. This was confirmed by the Supreme Court. *See United States v. Winstar*, 518 U.S. 839, 877, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), the Supreme Court also held that legislation could itself be the "statement by the obligor to the obligee indicating that the obligor will commit a breach."

---

**3.** Section 1074(b), in relevant part, provided that: Retirees of the uniformed services, "under joint regulations to be prescribed by the Secretary of Defense and the Secretary of Health, Education, and Welfare, ... may, upon request, be given medical and dental care in any facility of any uniformed service, subject to the availability of space and facilities and the capabilities of the medical and dental staff." *See also* 10 U.S.C. § 1076(b) (covering dependents of retirees).

*Id.* at 619, 120 S.Ct. 2423. The fact that the secretaries' repudiation of the contract to provide lifetime health care may have "rested upon the enactment of a new statute makes no significant difference." *Id.* at 620, 120 S.Ct. 2423.

In *Winstar*, the Federal Home Loan Bank Board, a federal agency acting under delegated congressional authority, entered into agreements with several thrifts "to accord them particular regulatory treatment in exchange for their assumption of liabilities that threatened to produce claims against the Government as insurer." 518 U.S. at 843, 116 S.Ct. 2432. Despite the highly regulated nature of the savings and loan industry and the likelihood of changes to the regulatory structure during the pendency of the agreements, the Supreme Court applied the ordinary principles of contract construction and breach that would be applicable to contracts between private parties and held the agreements to be enforceable. *Id.* at 870, 116 S.Ct. 2432. Although the board could not prevent Congress from changing the rules, the agreements were valid promises to insure the thrifts against loss arising from future regulatory changes. *Id.* at 869–70, 116 S.Ct. 2432; *New Valley Corp. v. United States*, 119 F.3d 1576, 1582 (Fed.Cir. 1997) ("[R]egardless of the sovereign acts doctrine, the contracts shifted responsibility to the government for changes in its launch priority and scheduling policy."); *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 959 (Fed.Cir. 1993) (Government "contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding...."); *Amino Bros. Co. v.*

*United States*, 178 Ct.Cl. 515, 372 F.2d 485, 491 (1967) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.") (quoted in *Winstar*, 518 U.S. at 881–82, 116 S.Ct. 2432). The Supreme Court made clear that "the National Government has some capacity to make agreements binding future Congresses by creating vested rights," and concluded that the promised regulatory treatment was within that capacity. *Winstar*, 518 U.S. at 876, 116 S.Ct. 2432.

Here, the secretaries had congressional authority delegated by 5 U.S.C. § 301 to make contracts to provide lifetime health care, and they did. This created a contractual right to that health care that the passage of 10 U.S.C. §§ 1074(b) and 1076(b) could not divest. The notion that the federal government could avoid a contractual obligation through subsequent legislation would conflict with the government's "own long-run interest as a reliable contracting partner in the myriad workaday transactions of its agencies." *Winstar*, 518 U.S. at 883, 116 S.Ct. 2432. The government has the power to enter into contracts which confer rights, and has the duty to honor them. *Id.* at 884 n. 28, 116 S.Ct. 2432. "To say that the Congress may withdraw or ignore [the government's] pledge, is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government." *Perry v. United States*, 294 U.S. 330, 351, 55 S.Ct. 432, 79 L.Ed. 912 (1935). "Congress was free to reduce gra-

tuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *Lynch,* 292 U.S. at 580, 54 S.Ct. 840.

The retirees entered active duty in the armed forces and completed at least twenty years service on the good faith belief that the government would fulfill its promises. The government cannot repudiate the contract now. "In contracts involving the government, as with all contractual relationships, rights vest and contract terms become binding when, after arms length negotiation, all parties to the contract agree to exchange real obligations for real benefits." *Winstar,* 64 F.3d at 1546. Given the existence of medical facilities and the medical care for retirees already provided by the government, the retirees should not be asked now to pay for something they have long had, and were promised, as part of their deal with the military when they agreed to devote their professional lives to it.

## III.

The court's suggestion that the Anti–Deficiency Act limits the congressional authority delegated by section 301 is curious but, in any event, does not support the decision. Neither *Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442 (Fed.Cir.1997), nor any Supreme Court case supports the conclusion that the Anti–Deficiency Act, 31 U.S.C. § 1341 (1994), precludes the government from contracting with recruits for retirement benefits. That Act is inapplicable, first, because as shown, 5 U.S.C. § 301 delegates broad authority to service secretaries to recruit servicemen. And of

course, there never has been a deficiency in funding. But even if there had it would not constitute a defense for breach of contract, *Ferris v. United States,* 27 Ct.Cl. 542, 546 (1892), or bar recovery of a judgment against the government, *Parsons v. United States,* 15 Ct.Cl. 246, 246 (1879). Insufficient appropriations at the agency level may preclude local disbursements, but they do not "pay the government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris,* 27 Ct.Cl. at 546. The Act is inapplicable, second, because the statutes relevant to the retirees here are those in effect in 1951 for Schism and 1953 for Reinlie. And, even if the later enacted Anti–Deficiency Act could somehow control the retirees' right to promised lifetime health care, it cannot abrogate an existing contract without creating liability for that abrogation.

The court's exegesis of 5 U.S.C. § 70 (now codified at 5 U.S.C. § 5536) is based on the false premise that military compensation does not include health care benefits. Military retirement benefits are considered deferred compensation for past services. *See Barker v. Kansas,* 503 U.S. 594, 604, 112 S.Ct. 1619, 118 L.Ed.2d 243 (1992). Section 70 covers "additional pay, extra allowance, or compensation, in any form whatever." 5 U.S.C. § 70 (1946). As the Supreme Court has pointedly stated: "The law was passed to remedy an evil which had existed, of detailing officers with fixed pay to perform duties outside of their regular employment, and paying them for it, when the government was entitled, without this double pay, to all their services. The law prohibited, and was intended to do so, the allowance of such claims as these, made by public officers, for extra compensation, on the ground of extra services." *Stansbury v. United States,* 75 U.S. (8 Wall.) 33, 37, 19

L.Ed. 315 (1868). Moreover, in that case the Secretary of the Interior was prevented from paying a claim because there was neither congressional appropriation to pay it nor congressional approval to create an agency to perform the service in question. *Id.* at 36, 19 L.Ed. 315, 8 Wall. 33. Extra compensation is in no sense the issue here. The question is whether the health services provided these retirees should be paid out of funds already appropriated, or whether the retirees must advert to their own resources for those services, contrary to their contract with the government when they signed up.

I also part company with the court in its conclusion that there is no meaningful difference between the benefits that the Supreme Court has identified as beyond the reach of contracts, and the promises that led to implied-in-fact contracts for lifetime health care. *United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48, *Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365, *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, and *United States v. Teller,* 107 U.S. 64, 2 S.Ct. 39, 27 L.Ed. 352 (1883), stand for the proposition that one may not rely on a purported contract he has made with the government if the contract conflicts with the express terms of a law or regulation. But this does not mean one's contractual claim against the government must be based on a specifically worded law, rule or regulation to be valid. Where no specific statute or regulation contradicts the terms of a government contract, the validity of the contract depends on common-law rules of contract. *See Winstar,* 518 U.S. at 870, 116 S.Ct. 2432.

This court has recognized breach of contract claims based on servicemen's enlistment agreements coupled with recruiter promises of assertedly non-monetary benefits, although all military activities have some monetary impact. *See Chu v. United States,* 773 F.2d 1226 (1985); *DeCrane v. United States,* 231 Ct.Cl. 951 (1982); *Grulke v. United States,* 228 Ct.Cl. 720 (1981). Contrary to the court, these cases support the very claim before us.

*DeCrane* recognized that a breach of contract claim may be based on the government's failure to give servicemen the benefit of promises made upon enlistment. 231 Ct.Cl. at 952. That case also reasoned that unless the government officials offering promises had authority, their promises would not bind the government, but the recruiters here did have authority. *Grulke* recognized that enlistment inducements, analogous to the inducements of this case, couched in terms of " 'promise' and 'guarantee' ... bolsters the bargained-for aspect that permeates the enlistment process." 228 Ct.Cl. at 724. It further recognized that "[f]or any nonperformance by the [government], it is necessary that some remedy be afforded when special program guarantees are breached and contract concepts have been applied in framing an appropriate solution to these claims." *Id. Chu* asked "whether federal officers and employees possess contractual rights which exceed their rights to continued employment." 773 F.2d at 1229. That has nothing to do with the issue before us.

IV.

The retirees also have a valid claim for a taking of their valuable vested right to permanent health care in violation of the Fifth Amendment of the Constitution. This court rejected a similar claim in *Sebastian v. United States,* 185 F.3d 1368 (Fed.Cir.1999), but I believe that case was

wrongly decided and I would take this en banc opportunity to correct it.

Contracts are property, "whether the obligor be a private individual, a municipality, a State, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch,* 292 U.S. at 579, 54 S.Ct. 840; *see also Bowen,* 477 U.S. at 52, 106 S.Ct. 2390 (the government "has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights"); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citing *Lynch,* 292 U.S. at 579, 54 S.Ct. 840 ("Valid contracts are property within [the] meaning of the Taking Clause.")); *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 278 n. 31, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). The Fifth Amendment prohibits the federal government from depriving a person of property "without due process of law" and from taking private property "without just compensation." U.S. Const. amend. V; *Lynch,* 292 U.S. at 579, 54 S.Ct. 840; *cf. Eastern Enters. v. Apfel,* 524 U.S. 498, 537, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Congress' enactment of the Coal Act improperly placed a severe, disproportionate, and extremely retroactive burden on Eastern and effected an unconstitutional taking) (plurality opinion).

To ascertain the retirees' vested property rights, we look to the contracts themselves. The bargain struck between the government and the retirees was simple. The government, through its service secretaries, was to provide lifetime health care for servicemen. In return, servicemen were to provide at least twenty years of service to the military.

The effort to lessen health care expenditure has required military retirees to pay for health care. This effectively requires the retirees' to pay the costs the government incurred as a result of promising lifetime health care, the very same costs for which the government assumed the burden. Put another way, the retirees must pay twice: once in active duty pay diminished by the value of the promised retirement health care; again when they do not get what was promised. Thus, the government retroactively abrogated the essence of the contract. Retroactivity is disfavored in the law in accordance with fundamental notions of justice. *Eastern Enters.,* 524 U.S. at 532, 118 S.Ct. 2131; *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). "[Moreover,] Congress [is] without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure would be not the practice of economy, but an act of repudiation." *Perry,* 294 U.S. at 352–53, 55 S.Ct. 432 (quoting *Lynch,* 292 U.S. at 580, 54 S.Ct. 840). The retirees' service fully paid the government for those benefits, and as the promisor of permanent health care, the government bore the burden of any unforeseen costs. The Fifth Amendment "was designed to bar Government from forcing some people alone to bear public burdens which ... should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *cf. Winstar Corp.,* 518 U.S. at 883, 116 S.Ct. 2432 (the government may not "simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change."). The government has deprived the retirees of their vested rights and they are entitled to recover.

PLAGER, Senior Circuit Judge, dissenting.

It is with a genuine sense of sadness that I join Chief Judge Mayer's dissent. I fully agree with his conclusion that the Government has deprived these retired veterans of their rights to the promised medical care. My sadness is not occasioned by any flaw in his well-reasoned and carefully-researched opinion. His clear and concise opinion demonstrates that the law is at least as much in the veteran claimants' favor as the opposite opinion, to which a majority of the court subscribes, argues to the contrary.

What is sad is that once again this court in dealing with the veterans matters entrusted to us places an ability to parse statutes and rules in the Government's favor above the more fundamental obligation to apply the law, when the issue is an open one, in favor of the veteran. The Supreme Court has stated that obligation in terms of "the canon that provisions for benefits to members of the Armed Forces are to be construed in the beneficiaries' favor." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n. 9, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (citations omitted). The Court cited that canon specifically to point out that, in the case before it, even if the statutory construction on which it relied was undercut by other statutes, the canon nevertheless would have required the Court to read the statute in the veteran's favor. The weight of the canon was again reaffirmed in *Brown v. Gardner*, 513 U.S. 115, 117–18, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

The canon expresses the Court's understanding of and appreciation for the contribution that the military services make to the free society we so willingly enjoy, and the obligations that the society has taken upon itself, equally willingly, in exchange for that contribution. What I find most troubling is the insistence by the Government, represented before us by the Department of Justice, to define the Government's justice as a 'win' on any basis possible. I find this troubling in the instant case even without reference to the special status of veterans. Abraham Lincoln said, and indeed it is engraved on the front of our courthouse, that "it is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same, between private individuals."

Perhaps the problem is that, with the demise of compulsory military service, too few of our citizens today have the experience of knowing firsthand what the military is about. When an individual, at the behest of the government acting through its authorized representatives, devotes essentially his or her productive lifetime to the defense of the rest of us, undertakes training that itself is inherently more dangerous than the typical civilian occupation, and stands ready to go in harm's way so that others need not, it ill behooves us— either the Executive or the Judiciary—to display the kind of public ingratitude that this case does. In my lifetime what peace we have enjoyed in this country has been the result not of yielding to threats, not of the diplomats' vague and hollow promises easily broken, but of the ability of this country to display military might and to use it effectively when all else fails. I see nothing to suggest that that will not be the case during the lifetimes of our children and grandchildren.

It is appropriate for the citizens of this country to be grateful to those who have given their lives to defend the country, and to those who are prepared to follow in that

noble tradition. Congress in its legislation throughout our history has established a clear policy of national recognition. for those who serve. When the law, to which we judges owe our first allegiance, is essentially in equipoise, as I believe the case to be here, we are free—indeed, it is our obligation—to invoke the principle that underlies the canon the Supreme Court has given us, and thus to arrive at a result that is in accord with the mandate of our forebears: "Justice, Justice Shalt Thou Pursue." [1]

I respectfully dissent from the decision denying relief to these veterans.